602 F.2d 401
 195 U.S.App.D.C. 223
 AMERICAN TELEPHONE & TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
Southern Pacific Communications Company, The Independent
Data Communications Manufacturers Association, Inc., Stanley
J. Samorajczyk, Trustee for Data Transmission Company,
Bankrupt, and Telenet Communications Corporation, Intervenors.
 No. 77-1742.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 19, 1979.
Decided May 21, 1979.
 
 George L. Saunders, Jr., Chicago, Ill., with whom David J. Lewis, Washington, D. C., F. Mark Garlinghouse, New York City, Edgar Mayfield, Bedminster, N. J., Alfred A. Green, New York City, and Harold S. Levy, New York City, were on brief, for petitioner.
 
 
 1
 John E. Ingle, Counsel, F. C. C., Washington, D. C., with whom Robert R. Bruce, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., and Barry M. Grossman and James F. Ponsoldt, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents. Robert B. Nicholson, Atty., Dept. of Justice, Washington, D. C., entered an appearance for respondent United States of America. Jack David Smith, Counsel, F. C. C., Washington, D. C., entered an appearance for respondent F. C. C.
 
 
 2
 James van R. Springer, Washington, D. C., with whom David I. Shapiro, Joel B. Kleinman, Walter J. Walvick, David A. Donohoe, and Courtenay Ellis, Washington, D. C., were on brief, for intervenor Stanley J. Samorajczyk, Trustee for Data Transmission Co., Bankrupt.
 
 
 3
 Thormund A. Miller, San Francisco, Cal., and James M. Tobin, Herbert E. Marks, and James E. Magee, Washington, D. C., were on brief for intervenor The Independent Data Communications Manufacturers Ass'n, Inc.
 
 
 4
 Stephen Ailes and Herbert E. Forrest, Washington, D. C., were on brief for intervenor Southern Pac. Communications Co.
 
 
 5
 Philip M. Walker and Donald E. Ward, Washington, D. C., were on brief for intervenor Telenet Communications Corp.
 
 
 6
 Before WRIGHT, Chief Judge, and ROBINSON and ROBB, Circuit Judges.
 
 
 7
 Opinion for the court filed by J. SKELLY WRIGHT, Chief Judge.
 
 J. SKELLY WRIGHT, Chief Judge:
 
 8
 On January 17, 1977, after a prolonged investigation, the Federal Communications Commission issued its Final Decision and Order cancelling an American Telephone & Telegraph Company tariff that set forth the rates, terms, and conditions under which a new data communications service was to be furnished.[1] AT&T now petitions this court to set aside some of the findings made by the Commission in the course of that decision and order. The company has already filed and placed into effect an amended tariff for the services in question and thus does not seek reinstatement of the one that the Commission cancelled. Nor does it urge us to set aside the agency's determination that the tariff was not shown to be just and reasonable as required by Section 201(b) of the Communications Act of 1934, 47 U.S.C. § 201(b) (1976), and was therefore unlawful. Rather, AT&T challenges only the Commission's finding that the rates set forth in the tariff and certain associated practices were "anticompetitive in effect and in violation of our policies of 'full and fair competition.' "[2] The Government argues that we lack jurisdiction to review subsidiary findings of this sort and, alternatively, that if we do reach the merits the administrative determination should be affirmed because it is supported by substantial record evidence.[3] We conclude that we have no jurisdiction to review the challenged findings. Accordingly, this petition must be dismissed.
 
 
 9
 * In June 1971 the FCC came to the conclusion that "a general policy in favor of the entry of new carriers in the specialized communications field would serve the public interest, convenience, and necessity." Specialized Common Carrier Services, 29 FCC2d 870, 920 (1971), Aff'd sub nom. Washington Utilities & Transportation Com'n v. FCC, 513 F.2d 1142 (9th Cir.), Cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975). Such a policy, the Commission contemplated, would stimulate innovation and help meet demand in the market for various sorts of "private line" communications services.[4]
 
 
 10
 One of the original Specialized Common Carrier applicants, Data Transmission Company (Datran),[5] had proposed a communications network capable of transmitting data signals in the digital language used by computers. At that time computer signals were transmitted by AT&T via its voice-type analog facilities a system which required that digital signals be converted into a form suitable for analog transmission on one end and then reconverted to computer language on the other.[6] Direct digital transmission and reception offered the possibility of greater accuracy and, once certain technological hurdles were surmounted, substantial savings. Datran began constructing facilities in 1972.
 
 
 11
 AT&T, meanwhile, had developed plans for its own digital transmission network which was to provide what it called DATAPHONE Digital Service (DDS). Those plans were premised upon a new technology known as Data Under Voice (DUV) which permits the use of an unallocated portion of the microwave radio spectrum for transmission of digital signals. In October 1972 AT&T applied under Section 214 of the Communications Act, 47 U.S.C. § 214 (1976), for a certificate of public convenience and necessity to construct and operate the first five-city segment of a proposed 96-city DDS network. The following July, finding the basic DUV technology to be sound, the Commission granted authority to construct the facilities described in the application. Operating authority, however, was withheld pending submission of certain cost and rate data as well as further consideration of objections lodged by competitors.[7]
 
 
 12
 AT&T applied in September 1973 for authority to construct and operate the DDS network in 19 additional cities. On March 19, 1974 it applied again for authority to operate the original five-city segment. Simultaneously, it filed its DDS Tariff No. 267 setting forth the rates, terms, and conditions under which it intended to offer the new service.
 
 
 13
 On December 16, 1974 the Commission granted AT&T's requests to operate the five-city segment and to construct and operate facilities in the additional 19 cities.[8] It stated, however, that doubts remained about the validity of the rates set forth in Tariff No. 267[9] and designated a number of issues concerning the lawfulness and competitive effects of those rates for a full investigation and hearing.[10] In the interim it ordered that the Tariff No. 267 rates could only be employed in the original five cities. DDS service in the additional 19 would have to be offered at the generally higher rates that then governed AT&T's analog transmissions until either the expiration of one year or the termination of the designated hearing and investigation.[11]
 
 
 14
 Six months later, after service had commenced in the original five cities and construction was under way in the other 19, AT&T filed for authority both to expand the transmission facilities in the 24 cities then authorized and to construct and operate DDS facilities in an additional 40 cities. On August 23, 1976 the Commission granted authority to augment the 24-city facilities and deferred a decision on the application to serve 40 new cities pending resolution of the proceedings concerning Tariff No. 267 which are the subject of the instant petition for review.[12]
 
 
 15
 Those proceedings commenced shortly after the Commission's December 16, 1974 order designating the tariff for a hearing on various ratemaking issues. Among the designated issues were (1) whether the rates "are or will be unjust and unreasonable" within the meaning of the Communications Act; (2) whether the rates could "subject any person or class of persons to unjust or unreasonable discrimination or give any undue or unreasonable preference or prejudice to any person, class of persons, or locality"; (3) whether DDS, "as reflected in the tariff filing described herein, involves rates or practices which may be anti-competitive or otherwise unlawful"; and (4) whether the ratemaking and cost-allocation principles employed by AT&T "are appropriate to the types of competitive services proposed * * * and whether the costs derived therefrom justify the charges for the proposed service."[13] In an effort to expedite the case, the Commission ordered that the hearing proceed via submission of written interrogatories and responses and provided that oral evidentiary proceedings could be ordered only if the "paper hearing" approach failed to elicit needed information.[14]
 
 
 16
 The Initial Decision of the two Administrative Law Judges who presided was released on July 2, 1976.[15] They concluded that the DDS Tariff No. 267 rates were unjust and unreasonable, discriminatory, and anticompetitive. More particularly, they found (1) that AT&T had materially overestimated the likely revenues from DDS service and underestimated the investment and expenses,[16] (2) that "AT&T has failed to demonstrate that (the DDS) rates are just and reasonable,"[17] (3) that in fact "(t)he rates appear to be unjust and unreasonable,"[18] (4) that the rates discriminated in favor of users of low speed transmission services,[19] (5) that the rates were predatory and anticompetitive,[20] and (6) that AT&T deliberately used various anticompetitive ratemaking techniques and thus was guilty of predatory and anticompetitive intent.[21]
 
 
 17
 AT&T filed exceptions to the Initial Decision, as did the Commission's trial staff and various intervenors. On January 17, 1977 the Commission issued its Final Decision and Order affirming, with a few significant exceptions, the ALJ's conclusions.[22] The Commission first explored the general issue of the reasonableness of the DDS tariff. It found that AT&T's market projections were unjustified and tended to overstate demand and revenues and that its cost studies both those based on Long Run Incremental Costs (LRIC) and those utilizing Fully Distributed Cost (FDC) methodologies[23] were unjustified and tended systematically to understate likely costs. "This overstatement of revenues and understatement of costs," the Commission stated, "enabled AT&T to apparently justify rates for DDS which are in fact not justified."[24] It then proceeded to take official notice of certain rather low earnings ratios derived from actual operation of the then existing 24-city network and to state that trends revealed by those ratios provided sufficient reason to reach a finding that the DDS rates were "non-compensatory."[25] The Commission went on to find that the rate structure set forth in Tariff No. 267 was unjustified, to discuss various ratemaking principles, and to conclude that the Tariff No. 267 rates had not been shown to be just and reasonable and were in fact unjust and unreasonable and in violation of Section 201(b) of the Communications Act, 47 U.S.C. § 201(b) (1976).[26]
 
 
 18
 Several pages later the Commission turned to the question of competitive effects and made the cluster of findings which AT&T now challenges. "(T)he unreasonably low price of the DDS service and the methods used in setting that price," the Commission stated, "could deprive the public of the benefits of competition * * *."[27] It found AT&T's conduct to be "an impediment to competition in the private line data communications market, in contravention of the competitive policy we adopted in the Specialized Common Carrier decision."[28] And it concluded that "the DDS rates and certain associated practices of AT&T were anticompetitive in effect and in violation of our policies of 'full and fair competition.' "[29] While these findings do in large measure affirm the Initial Decision, the Commission specifically eschewed any finding of predatory or anticompetitive intent on grounds that such a finding was "unnecessary for the performance of our regulatory duties * * *."[30]
 
 
 19
 Having found the Tariff No. 267 rates to be unjust and unreasonable, discriminatory, and anticompetitive, the Commission proceeded to order that the tariff be null and void and to require that AT&T submit interim replacement rates by February 22, 1977 and a fully justified permanent tariff somewhat later.[31] AT&T sought reconsideration and, on June 20, 1977, the Commission declined materially to alter its decision and order.[32] While its petition for reconsideration was pending, AT&T filed interim revised DDS rates as the Commission had ordered. Shortly after the release of the final Memorandum Opinion, these rates were again amended, this time in connection with both the decision in the instant proceedings and the Commission's final decision in the quite separate proceedings it had been conducting in what is referred to as the Docket 18128 case.[33] In that decision, which was released October 1, 1976, the Commission set forth comprehensive standards and requirements relating to ratemaking for communications services.
 
 
 20
 AT&T petitioned this court for review of the DDS decision on August 17, 1977. Apparently because its Tariff No. 267 rates had already been replaced and rendered subject to the new Docket 18128 standards, as detailed above, AT&T does not seek to reinstate its original tariff or otherwise to alter the Commission's ultimate order. Rather it challenges only the findings relating to anticompetitive practices and effects.
 
 II
 
 21
 This court's jurisdiction is invoked pursuant to Section 402(a) of the Communications Act, 47 U.S.C. § 402(a) (1976), and 28 U.S.C. § 2342 (1976). Section 402(a) provides in relevant part:
 
 
 22
 Any proceeding to enjoin, set aside, annul, or suspend any Order of the Commission * * * (with exceptions not relevant here) shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28.
 
 
 23
 47 U.S.C. § 402(a) (emphasis added). Chapter 158 of Title 28 includes 28 U.S.C. § 2342, which provides:
 
 S 2342. Jurisdiction of court of appeals
 
 24
 The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of
 
 
 25
 (1) all Final orders of the Federal Communication (Sic ) Commission made reviewable by section 402(a) of title 47(.)
 
 
 26
 (Emphasis added.) The Government contends that the present petition must be dismissed because AT&T does not challenge a Commission Order and thus falls outside the jurisdictional grant.[34] AT&T counters by asserting first that the mere nomenclature given to the findings which it challenges is irrelevant and second that those findings should be deemed an Order because they will have a material adverse impact on the company in future regulatory and judicial proceedings. Accordingly, it urges, we have jurisdiction to entertain the instant petition.
 
 
 27
 There is no question but that the Commission did issue an Order it declared the DDS tariff null and void and required new tariffs to be filed accompanied by particular sorts of information. The problem here is that AT&T does not challenge that order and has in fact complied in material respects. Instead it attacks only the findings of anticompetitive effects.[35] In essence, then, AT&T asks this court selectively to excise from the order's foundation certain portions it finds objectionable. Moreover, the company makes this request while conceding that such selective excision would not cause the foundation to crumble[36] and while professing indifference to the edifice on top. We do not think that Sections 402(a) and 2342 authorize this court to embark on architectural revisions of this sort.
 
 
 28
 In its argument to the contrary AT&T places primary reliance on two decisions of this court Straus Communications, Inc. v. FCC, 174 U.S.App.D.C. 149, 530 F.2d 1001 (1976), and AT&T v. FCC, 179 U.S.App.D.C. 328, 551 F.2d 1287 (1977), reversing Referral of "Chastain, et al. v. AT&T", 43 FCC2d 1079 (1973). In Straus we found reviewable under Sections 402(a) and 2342 an FCC "letter" holding the petitioner to have violated the Personal Attack Rule of the Fairness Doctrine and setting forth certain principles for interpreting that rule.[37] The letter was not styled as an order and it expressly stopped short of imposing any sanction. Yet we found no insurmountable bar to review. "That the FCC's letter here is not called an 'order' is of course no obstacle," we observed, "but there still must be some modicum of injury, some concrete effect upon the station sufficient to support a court's jurisdiction."[38] We then noted that the determination that the petitioner had violated the Fairness Doctrine would become a permanent part of the station's record. In light of a provision in the applicable statute authorizing a $1,000 forfeiture in cases of willful or Repeated violations,[39] we found the presence of such a determination in Straus' record would in all likelihood mean "that future violations by this station would stand to suffer harsher treatment than similar violations by other stations."[40] This we found to be "sufficient to make the letter a final order ripe for review * * *."[41]
 
 
 29
 In the Chastain case we considered a Commission order that was issued at the close of a proceeding which had been triggered by a referral from an antitrust court.[42] The Commission had concluded that various AT&T practices relating to mobile telephones were unreasonable and in violation of the Communications Act. It had provided for a sanction for one of the violations and then transmitted its decision to the antitrust court.[43] While AT&T's petition to review the Commission's order was pending in this court, the underlying antitrust suit was settled. We found that the petition for review had not been mooted by the settlement because "the Commission's order continues to have legal and practical impact on AT&T."[44] In support of the conclusion that the controversy had survived the dismissal of the antitrust suit we noted that private parties and the Commission had invoked the Chastain ruling in subsequent administrative proceedings.[45]
 
 
 30
 AT&T attempts to use Straus and Chastain in tandem to establish the proposition that the Order requirement in the jurisdictional statutes is met whenever there exists an agency determination whatever its context or relationship to actual agency action or requirements which may have an adverse impact upon the petitioner. Straus, the argument goes, made clear that the label affixed to the agency determination matters not and Chastain demonstrated that the proper inquiry is into the likelihood of future harms flowing to petitioner from the challenged findings. In our judgment, this reading of Straus and Chastain seriously distorts both opinions and strains the jurisdictional statutes to the breaking point. Further, we believe that AT&T has failed in any event to demonstrate that there exists a substantial probability that it will be harmed by the findings in suit.
 
 
 31
 In the first place, although Straus establishes that the terminology used by the Commission will not itself be an insuperable barrier to review, that decision in no way suggested that there exist no barriers. Straus merely stands as a bulwark against formalism it states that the Commission cannot escape review simply by dangling rather than dropping its sword. In the context of a statute that makes penalties turn on repeated violations (and a regulatory regime in which periodic license renewal proceedings are a fact of life) we recognized that the primary force of a declaration that the station was in violation would be felt whether or not a penalty were actually assessed. We did not hold or imply that the possibility of adverse impacts would always be sufficient to trigger jurisdiction or to override whatever presumption of nonreviewability would normally attach in the absence of a challenge to an actual sanction or order. Nor did we conclude that the term Order in Sections 402(a) and 2342 was intended to serve merely as a barometer for measuring the likelihood of harms no matter how indirect or incidental. Instead we concluded only that an inherently coercive determination reached at the conclusion of a proceeding intended primarily to adjudicate the lawfulness of past conduct could not be insulated from judicial scrutiny by a decision not to impose a forfeiture.
 
 
 32
 Chastain, in our opinion, is even more narrow. There we were faced with a relatively ordinary mootness problem. We had simply to determine whether the administrative proceedings had taken on a life and adversary character of their own or whether they remained wholly derivative of the antitrust dispute from which they stemmed. Our conclusion was that the case had come to resemble a garden-variety administrative proceeding: the agency had made findings, drawn conclusions, imposed a sanction, and issued an order. A petition to review such a proceeding would in the normal course of things have fit squarely within Sections 402(a) and 2342. We just determined that such an otherwise proper petition had not been mooted by the settlement of the triggering dispute between the private antitrust plaintiff and AT&T. Nowhere did we purport to decide what sorts of determinations are reviewable under Sections 402(a) and 2342.
 
 
 33
 Having established that Straus and Chastain do not support the broad interpretation of our jurisdiction sought by AT&T, it remains only to note that we believe the assertion of jurisdiction here would be contrary to both the letter and the spirit of the statutes involved. Congress explicitly limited our review to agency orders. If we were to construe that term to encompass every agency move which might cause someone future harm, we would in effect be reading the congressional limitation out of existence by permitting review whenever there existed a petitioner with a motive for seeking it and forbidding review only when there existed no one with such a motive. Such a reading would be entirely implausible. It would cause considerable mischief. It would in effect permit the Courts of Appeals at the whim of parties not otherwise aggrieved to scrutinize administrators' passing remarks, overturn their subsidiary factual determinations, and stalk their every step along alternative paths of reasoning. The result would be a heavy burden on court and agency alike.
 
 
 34
 We do not, of course, dispute that Sections 402(a) and 2342 contain sufficient play to permit judicial intervention where it seems that an agency has departed from the normal course of its proceedings to make gratuitous prejudicial determinations or has otherwise cloaked the kinds of actions and harms normally associated with orders in nonreviewable garb. But here we have neither evidence of any procedural manipulation nor a showing of genuine substantial harms. There was nothing unusual or gratuitous about the Commission's inquiry into competitive effects; it fell squarely within the normal scope of the ratemaking proceeding.[46] Indeed, the Commission went out of its way to avoid any findings as to the presence or absence of anticompetitive Intent for the very reason that such a finding would have been unnecessary.[47] The absence of any findings of intent also sharply reduces the chances that the DDS decision will have a genuine adverse impact on AT&T in future regulatory or judicial proceedings. The Commission merely found that certain rates which have long since been replaced were anticompetitive in effect. Such a finding will not be collateral estoppel in future proceedings and can therefore be rebutted by AT&T whenever it is invoked.[48] Moreover, its probative value is somewhat limited the Commission was not interpreting or applying the antitrust laws[49] and it was not ruling on a continuing course of conduct. At most, then, the DDS rulings might be one piece of data presented to future forums, scrutinized for validity and relevance, and then considered along with other data in the course of whatever proceedings are pending. Any adverse impact in such a setting is wholly speculative.[50]
 
 
 35
 In sum, we find no merit in the assertion that we should circumvent the plain limiting language of Sections 402(a) and 2342 and no reason to conclude that the present case falls within what leeway those sections do provide.
 
 III
 
 36
 AT&T raises a final point which we must address the contention that if we conclude we lack jurisdiction the proper result is not to dismiss the petition but rather to remand to the Commission with directions to vacate the challenged findings. AT&T relies for this proposition on United States v. Munsingwear, Inc., 340 U.S. 36, 39, 71 S.Ct. 104, 95 L.Ed. 36 (1950), and its progeny.[51] In our judgment this reliance is misplaced. Munsingwear stated that when intervening circumstances render a lower court decision moot prior to appeal, the losing party's proper course is to secure from the appellate court an order vacating that decision. A similar result has been reached when the determination below is an agency order mooted prior to review.[52] And a broadly analogous approach has been used to excise a gratuitous lower court determination challenged by the party who prevailed in the balance of the lower court's decision.[53] But neither Munsingwear nor related cases proves workable in a situation like the present one where the petitioner challenges only one of a series of alternative grounds for an ultimate order which it does not challenge.
 
 
 37
 The problem is this: In the core Munsingwear situation the court is required simply to vacate the entire disposition below to wipe the slate clean. In the present case, in contrast, we are asked selectively to delete some of the grounds which support that disposition, while leaving the disposition itself in place. Yet we would have no way of determining which of the Commission's findings ought to be deemed truly necessary to the ultimate order and which ought to be vacated.[54] Petitioner in effect claims that It should be able to make this determination to pick and choose among the Commission's grounds, eliminating whatever it finds objectionable and leaving in place only so much as is necessary to support the ultimate order. We are aware of no principle of law which requires that petitioner be given a free hand to engage in such revisions. Nor do we believe that we have the authority to do so. Indeed, we think that any effort to require selective deletion would be highly improper it would have the effect of telling the Commission that it is not free to marshal as many relevant alternative grounds for its orders as it can. There is no reason to so cabin the agency's freedom.[55]
 
 
 38
 As a result, however desirable it may be in a proper case to vacate mooted and hence unreviewable orders under Munsingwear, that principle cannot properly be applied in a case like the present when what is challenged is merely one of several alternative grounds.
 
 IV
 
 39
 For the reasons set forth above, AT&T's petition for review is dismissed for want of jurisdiction.
 
 
 40
 So ordered.
 
 
 
 [1]
 In the Matter of American Telephone and Telegraph Company, Investigation into the lawfulness of Tariff F.C.C. No. 267, offering a Dataphone Digital Service Between Five Cities (Docket No. 20288), 62 FCC2d 774 (Jan. 17, 1977) (hereinafter referred to as Final Decision and Order). This decision is reproduced in the Joint Appendix (JA) at 355
 
 
 [2]
 Final Decision and Order, Supra note 1, 62 FCC2d at 806-807, JA 387-388
 
 
 [3]
 Four intervenors filed a joint brief which argues that we have jurisdiction over the AT&T petition and then urges affirmance. They are: the Trustee in Bankruptcy of Data Transmission Company ("Datran"), a competitor in the data communications market; Southern Pacific Communications Company, a common carrier using terrestrial and satellite facilities to transmit data and other information and which acquired Datran's assets in 1976; The Independent Data Communications Manufacturers Association, an association of equipment manufacturers that are not affiliated with telecommunications common carriers and compete with AT&T's manufacturing subsidiary, the Western Electric Company; and Telenet Communications Corporation, a common carrier which provides data communications services via various leased facilities. Counsel for the intervenors stated during oral argument that they would not contest a determination that this court lacks jurisdiction over the issues raised so long as the challenged findings were not vacated in the wake of such a determination pursuant to the principles discussed in Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 329-331, 82 S.Ct. 337, 7 L.Ed.2d 317 (1961), and United States v. Munsingwear, Inc., 340 U.S. 36, 39-40, 71 S.Ct. 104, 95 L.Ed. 36 (1950). See Part III Infra. The Independent Data Communications Manufacturers Association apparently takes no position on the jurisdictional question. Intervenors' brief at 27 n.17a
 
 
 [4]
 It is common to divide interstate common carrier communications services into two categories public services, which include both regular long distance telephone service and wide area telecommunications service (WATS), and private line (or leased line) services. Typically the latter provide the customer with a continuously open line of audio, visual, or data communication between two points, while public services involve the establishment of a new connection for each message. Public services have traditionally been a monopoly offering, while private line services have been open to varying and increasing degrees of competition. See generally Nader v. FCC, 172 U.S.App.D.C. 1, 6, 520 F.2d 182, 187 (1975); Washington Utilities & Transportation Com'n v. FCC, 513 F.2d 1142, 1155 (9th Cir.), Cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975)
 
 
 [5]
 Specialized Common Carrier Services, 29 FCC2d 870, 872-874 (1971), Aff'd sub nom. Washington Utilities & Transportation Com'n v. FCC, supra note 4. Datran is represented in the instant proceedings by its Trustee in Bankruptcy. See note 3 Supra
 
 
 [6]
 Analog transmission uses a continuously variable signal capable of replicating normal sounds. Digital transmission, in contrast, consists of pulses and gaps. This rapid stream of on-off signals permits ready replication of the binary languages used by most computers
 
 
 [7]
 In the Matter of the Application of American Telephone & Telegraph Co., 41 FCC2d 586, 587-588 (July 2, 1973)
 
 
 [8]
 In the Matter of the Application of American Telephone & Telegraph Co. (Docket No. 20288), 50 FCC2d 501 (Dec. 16, 1974) (hereinafter referred to as the Designation Order). The Designation Order is reproduced at JA 6
 
 
 [9]
 Designation Order, Supra note 8, 50 FCC2d at 509-511, JA 14-16
 
 
 [10]
 Id., 50 FCC2d at 514-515, JA 19-20
 
 
 [11]
 Id., 50 FCC2d at 511-513, JA 16-18. The analog rates which the Commission ordered AT&T to use were on average 32% Higher for the lowest DDS transmission speed the speed for which demand was expected to be highest. Final Decision and Order, Supra note 1, 62 FCC2d at 780, JA 361
 
 
 [12]
 In re Application of American Telephone & Telegraph Company and 17 Associated Bell System Companies, 60 FCC2d 835 (Aug. 23, 1976)
 
 
 [13]
 Designation Order, Supra note 8, 50 FCC2d at 514-515, JA 19-20. In addition to the matters noted in text, the Commission specified that the hearing should explore whether, if the filed rates were unlawful in any respect, the Commission should prescribe rates under § 205 of the Act, 47 U.S.C. § 205; whether DDS "represents a just and reasonable discrete classification of service" under § 201(b), 47 U.S.C. § 201(b); whether certain terms and conditions governing resale and shared use were just and reasonable; and whether the tariff schedules conformed to § 203 of the Act (47 U.S.C. § 203) and various Commission regulations set forth in 47 C.F.R. Part 61 (1977). Designation Order, Supra, 50 FCC2d at 514-515, JA 19-20
 
 
 [14]
 Id., 50 FCC2d at 513, 515-516, JA 18, 20-21
 
 
 [15]
 In the Matter of American Telephone and Telegraph Company, Investigation into the lawfulness of Tariff F.C.C. No. 267, offering a Dataphone Digital Service Among Five Cities (Docket No. 20288), 62 FCC2d 815 (July 2, 1976) (hereinafter referred to as the Initial Decision). The Initial Decision is reproduced at JA 255
 
 
 [16]
 Initial Decision, Supra note 15, 62 FCC2d at 830-837, JA 270-277
 
 
 [17]
 Id., 62 FCC2d at 845, JA 285
 
 
 [18]
 Id
 
 
 [19]
 Id., 62 FCC2d at 845-846, JA 285-286
 
 
 [20]
 Id., 62 FCC2d at 841-843, JA 281-283
 
 
 [21]
 Id
 
 
 [22]
 Final Decision and Order, Supra note 1
 
 
 [23]
 Long Run Incremental Cost (LRIC) studies take into account only those attributable investments and expenses incurred for the purpose of furnishing the relevant service. Fully Distributed Cost (FDC) methods, in contrast, include not only incremental costs, but also an assignment or allocation of costs that are common to several services and would have been incurred regardless of whether or not the subject services were provided
 
 
 [24]
 Final Decision and Order, Supra note 1, 62 FCC2d at 790, JA 371
 
 
 [25]
 Id., 62 FCC2d at 790-792, JA 371-373
 
 
 [26]
 Id., 62 FCC2d at 792-795, JA 373-376
 
 
 [27]
 Id., 62 FCC2d at 799, JA 380
 
 
 [28]
 Id., 62 FCC2d at 802, JA 383
 
 
 [29]
 Id., 62 FCC2d at 806-807, JA 387-388
 
 
 [30]
 Id., 62 FCC2d at 802, JA 383
 
 
 [31]
 Id., 62 FCC2d at 807-809, JA 388-390. The Commission also set forth in some detail the data which AT&T would have to submit to justify its new DDS tariff
 
 
 [32]
 In the Matter of American Telephone and Telegraph Company, Investigation into the lawfulness of Tariff F.C.C. No. 267, offering a Dataphone Digital Service Between Five Cities (Docket No. 20288), 64 FCC2d 994 (June 20, 1977)
 
 
 [33]
 American Telephone and Telegraph Co., Revisions of Tariff F.C.C. No. 260, Private Line Services, Series 5000 (Telpak) (Docket No. 18128), 61 FCC2d 587 (Oct. 1, 1976), Appeal pending sub. nom. Aeronautical Radio, Inc. v. FCC & USA, D.C.Cir. No. 77-1333 Et al. In Docket 18128 the Commission determined that each of AT&T's classes of service including private line communications should earn roughly the same rate of return calculated on an FDC basis and rejected the use of LRIC studies to justify AT&T rates in competitive markets
 
 
 [34]
 The Government also argues that the limitation of review to Commission Orders is "consistent with the constitutional limitation of federal judicial power to 'cases or controversies.' " Respondent's brief at 28. See U.S.Const. Art. III, § 2. In addition, the Government contends that we should dismiss on grounds AT&T has failed to meet the exhaustion requirement set forth in § 405 of the Communications Act, 47 U.S.C. § 405 (1976). In light of our disposition we have no occasion to consider either the implicit Article III argument or the § 405 contentions
 
 
 [35]
 AT&T describes its posture as follows:
 AT&T has filed and placed in effect an amended tariff for the data communications service in question and does not here seek reinstatement of its former tariff. However, AT&T has petitioned this Court to set aside erroneous findings and conclusions in the Commission's decisions in (this case) which have had, and may continue to have, adverse effects upon AT&T in FCC regulatory proceedings. * * *
 Petitioner's brief at 2.
 The Government points out, with some force, that AT&T's position can be likened to that of a prevailing party who seeks to challenge on appeal some subsidiary determination made in the course of lower court proceedings. Respondent's brief at 29 n.23. Generally, of course, such a party cannot appeal. See 15 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3902 (1976). In unusual circumstances a prevailing party may be able to secure relief from certain unnecessary findings below. Cf. Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263 (1939), discussed at notes 53 & 54 Infra.
 
 
 [36]
 See petitioner's brief at 15 ("Having thus declared the DDS rates unlawful under Section 201(b) of the Communications Act (47 U.S.C. § 201(b) (1976)), the Commission could have ended its decision and still had findings which, if supported by the record, would permit its order that AT&T amend the DDS tariff for application in the future.")
 
 
 [37]
 Straus Communications, Inc. v. FCC, 174 U.S.App.D.C. 149, 154-155, 530 F.2d 1001, 1006-1007 (1976)
 
 
 [38]
 174 U.S.App.D.C. at 154, 530 F.2d at 1006 (footnote omitted). See also Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 416, 62 S.Ct. 1194, 1200, 86 L.Ed. 1562 (1942) ("(Review is available under § 402(a)) only if the Commission's order promulgating the regulations is an 'order' within the meaning of this section. The particular label placed upon it by the Commission is not necessarily conclusive, for it is the substance of what the Commission has purported to do and has done which is decisive."). The Columbia Broadcasting System case involved a challenge to chain broadcasting regulations promulgated by the Commission. The relevant parts of the decision focus upon questions concerning the proper way to challenge wholly prospective rules of general application which in themselves impose no immediate sanction. The case is thus of assistance to AT&T only indirectly: It suggests that Mere nomenclature is not dispositive, but says little about the reviewability of backward looking subsidiary findings such as those in suit
 
 
 [39]
 See 47 U.S.C. § 503(b) (1976)
 
 
 [40]
 Straus Communications, Inc. v. FCC, supra note 37, 174 U.S.App.D.C. at 154, 530 F.2d at 1006
 
 
 [41]
 174 U.S.App.D.C. at 154-155, 530 F.2d at 1006-1007
 
 
 [42]
 AT&T v. FCC, 179 U.S.App.D.C. 328, 551 F.2d 1287 (1977), reversing Referral of "Chastain, et al. v. AT&T", 43 FCC2d 1079 (1973)
 
 
 [43]
 Referral of "Chastain, et al. v. AT&T", supra note 42, 43 FCC2d at 1087-1088. In effect, the Commission treated the case like an ordinary complaint under the Communications Act
 
 
 [44]
 AT&T v. FCC, supra note 42, 179 U.S.App.D.C. at 331, 551 F.2d at 1290
 
 
 [45]
 Id
 
 
 [46]
 The Commission was of the opinion that it was required by the Communications Act to inquire into the possibility of anticompetitive consequences. See Final Decision and Order, Supra note 1, 62 FCC2d at 799, JA 380
 
 
 [47]
 See 195 U.S.App.D.C. at ----, 602 F.2d at 405 Supra. Whether a tangential and gratuitous exploration of and conclusions regarding AT&T's intent might have altered the disposition of this case is therefore a question we need not reach. See also in this connection Part III and notes 53 & 54 Infra
 
 
 [48]
 Under the Restatement (Second) of Judgments §§ 68, 68.1 (Tent. Draft No. 4 1977), for example, prior determinations will not have preclusive effect unless, among other things, they were actually litigated in the original forum, were essential to the final judgment reached by that forum, and could have been reviewed by an appellate court. The findings in suit appear poor candidates for collateral estoppel under these standards. Perhaps the major stumbling block stems from the requirements that the determination have been essential to the final judgment and appealable. The Restatement elaborates on the essentiality requirement in Comment I at 11 as follows: "If a judgment of a court of the first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone." See Stebbins v. Keystone Insurance Company, 156 U.S.App.D.C. 326, 481 F.2d 501 (1973). Here we not only have alternative grounds, but it is conceded that the grounds other than the findings now challenged are sufficient to support the ultimate order. Accordingly, if AT&T were to appeal that order it still would not be assured of obtaining review of the anticompetitive effect determination. Indeed, given one clearly adequate basis for the order appealed, it is inconceivable that an appellate court would undertake a wholly advisory exploration of the other basis. Comment I, supra, refers to precisely this problem: "(T)he losing party, although entitled to appeal from both determinations, might be dissuaded from doing so because of the likelihood that at least one of them would be upheld and the others not even reached." Id. at 12. In short, neither the essentiality nor the appealability requirement appears satisfied by the findings in suit. Beyond that, there is considerable doubt as to whether these findings were actually litigated. They were reached in the course of a ratemaking proceeding, and ratemaking is generally thought to be rulemaking rather than adjudication. See 5 U.S.C. § 551(4) (1976); AT&T v. FCC, 449 F.2d 439, 454-455 (2d Cir. 1971). Indeed, the paper hearing procedures used by the Commission apparently could not have been used had the proceedings been formal adjudication under the Administrative Procedure Act. See 5 U.S.C. § 556(d) (1976) (permitting hearing by written submissions in certain situations). As Professor Davis points out, "Only what is adjudicated can be res judicata." K. Davis, Administrative Law of the Seventies § 18.03 at 432 (1976)
 
 
 [49]
 The Commission observed that its decision "is neither seasoned with public interest cliches nor garnished with antitrust platitudes" and proceeded to note that its intention was "to examine the question of anticompetitive practices from the standpoint of our statutory mandate to make available an efficient communications system of reasonable cost, consistent with the public convenience and necessity, rather than within the structures of antitrust regulation and case law." Final Decision and Order, Supra note 1, 62 FCC2d at 798, JA 379. While the Commission went on to state that antitrust principles might be relevant to its inquiry and that it hoped to make regulatory obligations on carriers "consistent with similar obligations imposed pursuant to the antitrust laws," Id., there is no reason that an effort to impose Consistent obligations must result in Congruent ones. On the contrary, the standards applied in the DDS decision may be more restrictive than those common in antitrust cases. Compare, for example, the Commission's use of FDC studies with the general prevalence of the incremental or marginal cost idea in the law of predatory pricing. See generally Areeda & Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv. L. Rev. 697 (1975)
 AT&T has in fact been the target of antitrust suits by certain of the intervenors in the present litigation. See, e.g., Wyly Corp. v. AT&T, D. D.C. Civil Action No. 76-1544, filed August 18, 1976. Wyly Corporation was Datran's parent corporation.
 
 
 [50]
 Cf. FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 618-619, 64 S.Ct. 281, 88 L.Ed. 333 (1944); United States v. Los Angeles & Salt Lake R. Co., 273 U.S. 299, 309-310, 47 S.Ct. 413, 71 L.Ed. 651 (1927)
 
 
 [51]
 See, e.g., Mechling Barge Lines, Inc. v. United States, supra note 3, 368 U.S. at 329, 82 S.Ct. 337; Relf v. Weinberger, 184 U.S.App.D.C. 147, 152, 565 F.2d 722, 727 (1977); Nat'l Ass'n of Independent Television Producers & Distributors v. FCC, 170 U.S.App.D.C. 167, 172, 516 F.2d 760, 765 (1975)
 
 
 [52]
 See Mechling Barge Lines, Inc. v. United States, supra note 3; Nat'l Ass'n of Independent Television Producers & Distributors v. FCC, supra note 51
 
 
 [53]
 Electrical Fittings Corp. v. Thomas & Betts Co., supra note 35. In that case a party who had successfully defended against a patent infringement suit on noninfringement grounds was able to obtain on appeal an order striking from the decree a determination that one facet of the plaintiff's patent was valid
 
 
 [54]
 The Electrical Fittings case, Supra note 35, did not pose such a problem. There it was readily apparent that the determination that an aspect of the original plaintiff's patent was valid was neither necessary to nor supportive of the result. Accordingly, that finding could readily be deemed gratuitous and the finding of noninfringement essential. No other characterization was logically possible. In the alternative holding context before us today, in contrast, there can be several grounds adequate to support a given order and no valid principle for vacating some and deeming others essential. Compare in this regard the Electrical Fittings case with Hall v. U. S. Fiber & Plastics Corp., 476 F.2d 418, 420 (3d Cir. 1973). In Hall the District Court had held plaintiff's patent both Invalid and not infringed by the defendant. Plaintiff sought to appeal the finding of invalidity, and the Third Circuit declared the case moot because of the unchallenged noninfringement determination. The court did not, however, vacate the alternative holding of invalidity. It noted that a number of Courts of Appeals had come to the conclusion "that appeals of this type are moot and that the lower court judgment of patent invalidity will not be vacated." See id. at 420 and cases cited therein
 
 
 [55]
 Nor is there any Need for a requirement that alternative findings be stricken. Instead, the law of collateral estoppel will generally deal with the problem by denying preclusive effect to such findings. See, e.g., Restatement (Second) of Judgments, Supra note 48, Comment I at 11-12. See also note 48 Supra