**TOWN OF NORWOOD,
MASSACHUSETTS,
Plaintiff, Appellant,**

v.

**NEW ENGLAND POWER COMPANY,
New England Electric System
(NEES), Pacific Gas & Electric Company, and PG & E Corporation, Defendants, Appellees.**

No. 99–1047.

United States Court of Appeals,
First Circuit.

Heard Oct. 5, 1999.

Decided Feb. 2, 2000.

Charles F. Wheatley, Jr. with whom Wheatley & Ranquist, Kenneth M. Barna, Alan K. Posner and Rubin & Rudman were on brief for plaintiff.

Edward Berlin with whom Robert V. Zener, Swidler Berlin Shereff Friedman, LLP, John F. Sherman, III, Associate General Counsel, The NEES Companies, David H. Erichsen, Peter A. Spaeth and Hale and Dorr LLP were on brief for appellees New England Power Company and New England Electric System (NEES).

Steven W. Phillips with whom Richard M. Brunell, Robert L. Bocchino, Jr. and Foley, Hoag & Eliot LLP were on brief for appellees Pacific Gas & Electric Company and PG & E Corporation.

Before BOUDIN, STAHL and LIPEZ, Circuit Judges.

BOUDIN, Circuit Judge.

The Town of Norwood, Massachusetts ("Norwood") filed a complaint against New England Power Company ("New England Power") and others alleging antitrust violations and breach of contract. The district court dismissed the complaint and Norwood now appeals. This decision assumes a familiarity with our decision today in *Town of Norwood v. FERC*, 202 F.3d 392 (1st Cir.2000), resolving petitions filed by Norwood and another challenging orders of the Federal Energy Regulatory Commission ("FERC") in related administrative proceedings.

## I. THE HISTORY

To summarize the facts,[1] New England Power is a major wholesaler of electric power in New England, and Norwood owns and operates a municipal utility that distributes retail electric power to residents and businesses in the town. For some years Norwood purchased its power at wholesale from Boston Edison Company, but in the 1970s Norwood sought instead to purchase its power from New England Power and have that power delivered over the intercity transmission network of Boston Edison. Boston Edison and New England Power resisted, but the matter was resolved by settlement after Norwood brought an antitrust suit against them.

The settlements, arrived at in 1980 and 1983, included the agreement of Boston Edison to "wheel" power for Norwood over Boston Edison's transmission network and the agreement of New England Power to furnish all of Norwood's requirements for electricity through October 31, 1998, under New England Power's FERC Tariff No. 1 "as [it] may be amended from time to time." Under that tariff, New England Power then supplied power to its own retail affiliates such as Massachusetts Electric Company ("Mass Electric"). The decree in the antitrust case directed that the annexed settlement agreement and power contract were "approved as a settlement of this case and shall be carried out by both parties."

The parties amended the power contract in 1989 to give Norwood an option to extend the minimum term, and it then exercised the option to extend the contract to at least October 31, 2008.[2] Each side

---

1. We rely primarily on allegations in the complaint, documents attached to it, *see Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir.1998), and matters of public record, *see Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir.1993), but also take judicial notice of the record in our companion case and in the underlying FERC proceedings. *See McKin-*

*ney v. Waterman Steamship Corp.*, 925 F.2d 1, 5 (1st Cir.1991).

2. Norwood said in its second amended complaint that it extended the original contract for ten years to October 31, 2008, but then "elected to withdraw [the extension]"; in various later submissions to the district court it said that the extension was not effective.

could terminate on seven years' advance notice. New England Power had somewhat similar requirements contracts with its own affiliates and with other independent retailers embodying similar lengthy periods of notice before termination. The function of such lengthy notice periods is to permit stability for each side; the wholesaler, for example, ordinarily makes investments or other arrangements to assure a stable supply of power either by generation, purchase contracts of its own, or both. *See generally Kentucky Utils. Co. v. FERC,* 766 F.2d 239, 243 (6th Cir. 1985).

Beginning in December 1996, New England Power made a set of regulatory filings to restructure itself and to revise its existing tariffs for wholesale power sales in Massachusetts and Rhode Island. These filings, described in more detail in our companion decision, had several aims: approval by FERC of the sale of New England Power's non-nuclear generating facilities to a west coast utility; the release of New England Power affiliates like Mass Electric from their long-term obligations to purchase their power from New England Power; and the restructuring of New England Power's wholesale rates to affiliates and interested purchasers to facilitate customer choice and market-based pricing at both the wholesale and retail level.

To accommodate policies of both the Massachusetts and Rhode Island state utility commissions, New England Power also proposed a temporary, non-cost-based wholesale offering called "standard offer service." This temporary offering was to provide power at predetermined rates, increasing rapidly over a multi-year period,[3] to those retailers required by the states to offer counterpart retail standard offer rates to their own customers; the states were introducing competition at the retail level and wanted retail purchasers to have an initial low-rate offering as a backup while competitive sources of supply developed for them, *e.g., In re Massachusetts Elec. Co.,* Mass. D.P.U. 96–25, at 23–25 (Feb. 26, 1997); *see also* Mass. Gen. Laws ch. 164, § 1B(b); R.I. Gen. Laws § 39–1–27.3. Such retail sellers include Mass Electric and other investor-owned retailers but not municipalities like Norwood, which have no obligation to allow competitive access to their customers. *See* Mass. Gen. Laws ch. 164, § 47A.

The prospective sale by New England Power of its low-cost hydroelectric and fossil generating facilities posed a potential problem for existing requirements-contract purchasers like Norwood, since New England Power's existing tariff rates (filed with FERC and incorporated by reference into power contracts) were normally amended to provide for price increases as New England Power's costs went up. To meet this objection, New England Power proposed to implement a rate freeze that would prevent increases in wholesale rates for its requirements-contract customers, including Norwood, during the term of their agreements.

While the initial filings of various proposals were under consideration by FERC, Norwood, on April 14, 1997, filed the present suit in the district court; this complaint, as later amended, named as defendants New England Power, its parent New England Electric System, and two companies that were part of the California-based parent utility system (collectively "PG & E") whose subsidiary ("USGenNE") was to acquire New England Power's non-nuclear generating facilities in New England. Between the original filing of the complaint and its later substantial revision

These claims of withdrawal or ineffectiveness were mentioned but not seriously developed in Norwood's brief, and we decline to address them. *Gamma Audio & Video, Inc. v. Ean-Chea,* 11 F.3d 1106, 1113 (1st Cir.1993).

**3.** For Mass Electric, the rate goes from 3.2 cents per kilowatt hour in 1998 to 5.1 cents per kilowatt hour in 2004. The low starting point and rapid elevation were intended to give customers protection at the start but then to encourage their migration to the competitive market.

through two amendments, additional events took place that are important to the present action.

First, in the FERC proceedings, the Commission ultimately approved a settlement agreement permitting (on payment of contract termination charges) early termination of requirements contracts by the affiliates of New England Power, *New England Power Co.*, 81 F.E.R.C. ¶ 61,281 (1997), *reh'g denied*, 83 F.E.R.C. ¶ 61,265 (1998); approved the offering of the new backup wholesale standard offer service, *id.;* approved the transfer of generating facilities and associated contracts to USGenNE, *New England Power Co.*, 82 F.E.R.C. ¶ 61,179 (1998), *reh'g denied*, 83 F.E.R.C. ¶ 61,275 (1998); and agreed to the FERC Tariff No. 1 rate freeze that would prevent post-divestiture rate increases to purchasers who chose to avoid the termination charge by continuing as wholesale customers of New England Power under their existing contracts, *id.*

Second, regarding itself as disadvantaged by the wholesale standard offer service made available to New England Power's retail affiliates—whom Norwood regards as retail competitors—Norwood notified New England Power on March 4, 1998, that it was switching to a different wholesale supplier, Northeast Utilities; a tariff and agreement to that effect were filed with FERC and have gone into effect. Two weeks later, on March 18, 1998, New England Power filed a revised FERC Tariff No. 1 permitting its non-settling wholesale customers like Norwood to terminate their contracts early, and on only 30 days' notice, with the condition that the customers pay a large contract termination charge. The charge was calculated based on the revenues that New England Power would have expected to collect had a customer continued to pay the now-frozen tariff rate through the contract term, less the expected costs avoided by not providing service.

As finally amended in April 1998, Norwood's complaint made a number of separate rate claims. In count 1, it charged that New England Power had violated the prior 1983 antitrust decree and power contract by divesting itself of its generating facilities, shifting Norwood to a fixed rate based on pre-divestiture costs, and proposing to serve its own affiliates on a quite different basis than the fixed rate (namely, market-based rates subject to the availability of the initially low-cost wholesale standard offer service).

The remaining three counts in Norwood's second amended complaint charged violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and sections 3 and 7 of the Clayton Act, 15 U.S.C. §§ 14, 18. The company attacked the contract termination charge imposed on Norwood under the revised FERC No. 1 Tariff as an illegal restraint of trade, an unlawful tying arrangement, and, in combination with the standard offer rates, an illegal price squeeze; it alleged a conspiracy to fix prices in the wholesale market; and it alleged a lessening of competition from the transfer of New England Power's non-nuclear generating assets to USGenNE.

After a motion by Norwood for partial summary judgment and motions to dismiss by the defendants, the district court on September 28, 1998, entered a decision dismissing the complaint under Fed. R.Civ.P. 12(b)(6). *Town of Norwood v. New England Power Co.*, 23 F.Supp.2d 109 (D.Mass.1998). In doing so, the court considered the allegations in the complaint, documents attached to it, and matters of public record including FERC decisions. In substance, the court rested its decision on FERC's scrutiny of the same transactions, the so-called filed rate doctrine, and the terms of the settlement agreement and power contract between Norwood and New England Power.

## II. *DISCUSSION*

1. At the threshold of this appeal is a substantial claim by New England Power that a procedural error by Norwood de-

prives us of jurisdiction to consider Norwood's main claims. After the district court entered its decision and judgment, Norwood filed a timely motion under Fed. R.Civ.P. 59(e) to alter or amend the judgment; after this was denied, it filed a notice of appeal in this court challenging the denial. Norwood then filed a motion under Fed.R.Civ.P. 60(b) for relief from the judgment on grounds of newly discovered evidence and, in the alternative, moved for a second time under Fed. R.Civ.P. 59(e) to alter or amend the judgment.

■ The district court denied both of the new motions, and Norwood then filed an amended notice of appeal challenging the denial of its post-judgment motions; but Norwood did not mention in either its original or amended notice of appeal the district court's *original* decision and judgment. New England Power points out that Norwood's brief is directed almost entirely to the original decision and judgment from which it says that Norwood did not appeal.

The law on this issue is less clear than the cases claim it to be. On the one hand, courts often say that a notice of appeal that names only a post-judgment order as the subject of the appeal does not bring the original judgment before the appellate court. *E.g., Mariani–Giron v. Acevedo–Ruiz,* 945 F.2d 1, 3 (1st Cir.1991). On the other hand, because in such cases the failure to name the underlying judgment is usually a slip of the pen and rarely causes any prejudice to the other side, courts then go through endless contortions to rescue the technically defaulted portion of the appeal. *See* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2818, at 192–93 & n. 11 (2d ed.1995) (collecting cases).

Sometimes this resurrection can be justified in common-sense terms where, for example, the caption of the notice refers to a post-judgment order but the body also refers to the underlying judgment, *see In re San Juan Dupont Plaza Hotel Fire Litig.,* 45 F.3d 564, 567 (1st Cir.1995), or where the appellant previously filed a premature notice of appeal challenging the underlying judgment, ineffective by itself but illustrating an intent to attack the judgment, *see Foman v. Davis,* 371 U.S. 178, 180–82, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 839–40 (1st Cir.1993), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). The latter is what occurred in *Foman,* relied upon by Norwood in this case. But Norwood did *not* file a premature notice of appeal designating the original judgment. *Cf. Gottesman v. INS,* 33 F.3d 383, 388 (4th Cir.1994).

However, Norwood's timely first motion to alter or amend the judgment—from denial of which Norwood did file a timely appeal—is not an ordinary Rule 59(e) motion limited to a narrow criticism or new objection. Instead, the motion covers (in 59 pages) more or less the *same* points that Norwood had earlier made to the district court and now repeats to us; indeed, the district court tersely denied the motion relying on its original decision. Under these circumstances, it seems to us that Norwood's appellate arguments are within the scope of its Rule 59(e) motion and are properly before us on appeal from the denial of that motion.

2. Turning to the merits, the first count in Norwood's complaint—effectively, a contract claim—rests on its assertion that New England Power breached its 1983 promises.[4] According to Norwood, New England Power was obligated to supply Norwood with power during the contract term, on a cost-justified, FERC-regu-

---

4. The 1983 antitrust decree is enforceable in the district court, *see generally In re Pearson,* 990 F.2d 653, 657 (1st Cir.1993), and a breach of the contract might amount to a breach of the decree. However, the decree itself did no more than adopt the settlement agreement and power contract; thus, if these commitments were not breached, neither was the decree.

lated basis, at the same rate level at which power was offered to affiliates of New England Power. Norwood asserts that New England Power breached these supposed promises by selling its low-cost generation facilities, providing Norwood with a substitute fixed rate based on pre-divestiture costs, and switching to market-based and standard offer rates for sales to its own affiliates.

The explicit target of this count is the contract termination charge imposed by the amended FERC Tariff No. 1 on non-settling purchasers who choose to terminate their requirements contracts without giving the requisite multi-year notice. Since other Tariff No. 1 purchasers (including the affiliates) appear to have settled, Norwood may be the only purchaser left in this category—although the other purchasers will also pay contract termination charges computed on a somewhat different basis. Norwood says the alleged breach by New England Power excuses Norwood's own abandonment of the contract, thereby avoiding a termination charge allegedly amounting to about $78 million over the remainder of the ten-year period.

■ The district court rejected Norwood's contract claim on two different grounds. It said that the claim was barred by the filed rate doctrine which—in the aspect pertinent here—limits attacks outside the regulatory process on tariffed rates filed with federal regulatory agencies. *E.g. Arkansas La. Gas Co. v. Hall,* 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981).[5] The district court also ruled, in the alternative, that the agreements were not breached by New England Power, because all it had promised to do was to provide FERC Tariff No. 1 rates to Norwood, which New England Power continued to do until Norwood itself renounced its requirements contract in

March 1998. *Town of Norwood,* 23 F.Supp.2d at 119.

■ We agree with Norwood that the filed rate doctrine does not bar Norwood's contract claim. It is true that, absent some exception, Norwood could not use its contract claim as a vehicle to attack the validity of the FERC tariff imposing the termination charge; the filed rate doctrine protects the agency's authority over tariffed rates and prefers a prevailing tariff (unless set aside by the agency) over any separate contractual arrangements, *AT&T v. Central Office Tel., Inc.,* 524 U.S. 214, 222–24, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998). While the termination charge is not a traditional "rate" for continuing service, the filed rate doctrine sweeps more broadly and governs ancillary conditions and terms included in the tariff. *Id.* at 224–25, 118 S.Ct. 1956.

Yet, under the amended tariff itself, *whether* a termination charge applies depends on *whether* there is a requirements contract in force. And FERC has at most approved only the generic terms of the amended tariff; it has not determined whether Norwood's prior obligation to buy from New England Power was vitiated by a breach on the part of New England Power, *New England Power Co.,* 84 F.E.R.C. ¶ 61,175, at 61,920 (1998), or some other means. *See* note 2, above. Perhaps it could have decided such issues, but it often leaves contract breach issues to courts, *Southern Cal. Edison Co.,* 85 F.E.R.C. ¶ 61,023, at 61,069 (1998), and it appears to have done so here. Thus, the tariff may be protected by the filed rate doctrine but whether the tariff applies to Norwood depends on the extent of Norwood's contractual obligations.

` ■ This brings us to the district court's alternative holding that New England Power did not breach the contract. The facts claimed by Norwood to be such a

---

**5.** As explained in our companion decision, the doctrine has various facets. It is the broader limitation on civil litigation that is of concern

here and not the narrower aspect discussed in our companion case.

breach are undisputed; they are the sale of facilities, the new terms for other customers, and the freezing of Norwood's rate. The question is whether those acts comprised a breach of contractual terms, an issue of law to be determined from the words of the contract, if they are unambiguous, and otherwise by the words along with whatever extrinsic evidence may cast light on the parties' intent. *Bank v. IBM,* 145 F.3d 420, 424 (1st Cir.1998). Here, the district court found that the words alone refuted Norwood's claim. *Town of Norwood,* 23 F.Supp.2d at 119.

The original 1983 power contract is pithy in its pertinent language: New England Power promises to supply Norwood its requirements pursuant to the former's FERC No. 1 Tariff, "filed with FERC, as [it] may be amended from time to time." At the time, New England Power's FERC Tariff No. 1 was its general cost-based offering of power to wholesale customers. But nothing in the contract explicitly required that the power be furnished from any specific set of generating facilities, or that New England Power's own affiliates continue to buy their power under this tariff, or that the rates be based upon costs calculated under any specific cost formula covering any specific period.

Norwood argued in the district court that the agreement's terms were ambiguous and, specifically, that "FERC Tariff No. 1" had a specialized meaning and reflected implicit conditions, *i.e.,* that the rates be based on current costs and used equally for New England Power's own affiliates. But while extrinsic evidence can be admitted to show ambiguity and to resolve it, *see Donoghue v. IBC USA (Publications), Inc.,* 70 F.3d 206, 215 (1st Cir. 1995), Norwood's affidavits show only that its *aim* was to achieve those goals and that FERC Tariff No. 1 was at that time struc-

tured as a traditional utility offering. Accordingly, we agree with the district court that the contract did not contain a promise that ownership of New England Power's facilities or equality of treatment vis à vis New England Power's affiliates would endure.

Probably Norwood assumed at the time that the world would continue as before, but there is an important difference between assumptions that exist when a contract is signed and promises built into a contract comprising a commitment. Under certain circumstances, the mere failure of underlying assumptions can release a party from a contract—one specific doctrine is frustration of purpose[6]—but it would take a developed line of reasoning, legal precedent, and specific facts showing the centrality of the assumptions and the extent to which their alteration makes it unjust to hold the unhappy party to its own promises. *See generally* II Farnsworth, *Farnsworth on Contracts* ch. 9 (2d ed.1998).

Norwood has made no such developed argument based on disappointed assumptions. The argument would probably be uphill in any event since New England Power has continued to offer Norwood the gist of what it was promised: a cost-based, long-term supply of electricity, subject to FERC regulation. In all events, it is normally not error at all, let alone plain error, for a court to ignore a possible claim or defense that a party fails to proffer and pursue. *E.g., Amcel Corp. v. International Executive Sales, Inc.,* 170 F.3d 32, 35–36 (1st Cir.1999).

3. This brings us to Norwood's pure antitrust claims, which are almost certainly weaker but (ironically) less easily disposed of on a motion to dismiss. Although there are numerous strands in Norwood's antitrust claims, two are of foremost impor-

6. The textbook example is the sale of a seat for a coronation later canceled. *Krell v. Henry,* [1903] 2 K.B. 740 (C.A.); *see also Northern Ind. Pub. Serv. Co. v. Carbon County Coal Co.,* 799 F.2d 265, 277 (7th Cir.1986). Other doc-trines related to failure of assumptions are those of mistake, II Farnsworth, *Farnsworth on Contracts* §§ 9.2–9.4 (2d ed.1998), and impossibility, *id.* §§ 9.5–9.6.

tance. One is a claim, primarily based on section 2 of the Sherman Act, that New England Power has engineered a "price squeeze" designed to undercut Norwood's ability to compete with New England Power's own retail affiliates. The other is a claim under section 7 of the Clayton Act that New England Power's sale of assets threatens to increase wholesale power prices in New England for purchasers like Norwood.

The district court dismissed all of Norwood's antitrust claims based on the filed rate doctrine. As already noted, one aspect of the doctrine protects a party from civil claims based on its implementation of tariffed rates (and ancillary tariffed matters) that are directly regulated by federal agencies like FERC. Its origin is the now-ancient *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922); but not very long ago the Supreme Court reaffirmed the *Keogh* doctrine in *Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), despite Judge Friendly's view that the doctrine had outlived its usefulness, *Square D Co. v. Niagara Frontier Tariff Bureau*, 760 F.2d 1347 (2d Cir. 1985).

 Norwood's price squeeze claim, in particular, rests on the combined effect of two different tariffs: the contract termination charge imposed on Norwood under New England Power's amended FERC Tariff No. 1; and the wholesale standard offer rate that was offered to New England Power's affiliates but not to municipalities like Norwood, a tariffed offering originally filed by New England Power and assumed by USGenNE as part of the FERC-approved asset sale. Both tariffs are not only subject to FERC regulation under the "just and reasonable" standard imposed by the Federal Power Act, 16 U.S.C. § 824d(a), but they were also ac-

tively at issue in the FERC proceedings described in our companion decision.[7]

The question, then, is whether Norwood can establish a pertinent limitation on or exception to the filed rate doctrine. Norwood's broadest claim is that the doctrine should not apply to antitrust cases involving price squeezes, a view endorsed in some measure by several circuits, *City of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1177–79 (8th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983); *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 929 (2d Cir.1981), and by the always enlightening Areeda treatise, IA Areeda & Hovenkamp, *Antitrust Law* ¶ 244e (rev. ed.1997). But the Supreme Court has itself applied the filed rate doctrine to antitrust claims generally, *e.g.*, *Square D Co.*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413, and most of the lower court cases that have excluded particular price squeeze claims appear to have done so on grounds that do not apply here.

 Specifically, the traditional price squeeze involves a defendant who as monopolist supplies the plaintiff at one level (*e.g.*, wholesale), competes at another (*e.g.*, retail), and seeks to destroy the plaintiff by holding up the wholesale price to the plaintiff while depressing the retail price to common customers. *See Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 18 (1st Cir.1990), *cert. denied*, 499 U.S. 931, 111 S.Ct. 1337, 113 L.Ed.2d 268 (1991). A few decisions, like *City of Kirkwood*, have rejected the filed rate defense in such situations where the monopolist supplier was subject to federal regulation at the wholesale level but not at the retail level. 671 F.2d at 1177–79. But the main concern— that no regulatory agency could afford full relief—is inapposite here because FERC regulates both of the tariffs in question.

7. *New England Power Co.*, 83 F.E.R.C. ¶ 61,-174 (1998), *reh'g denied*, 84 F.E.R.C. ¶ 61,175 (1998); *New England Power Co.*, 82 F.E.R.C. ¶ 61,179 (1998), *reh'g denied*, 83 F.E.R.C. ¶ 61,275 (1998); *New England Power Co.*, 81 F.E.R.C. ¶ 61,281 (1997), *reh'g denied*, 83 F.E.R.C. ¶ 61,265 (1998).

*See* IA Areeda & Hovenkamp, *supra,* ¶ 244e, at 90–91.

■ Next, Norwood says that the filed rate doctrine should not apply where the "regulated" rates have been left to the free market, the general direction in which FERC is moving. Of course, if New England Power's rates were truly left to the market, with no filing requirement or FERC supervision at all, the filed rate doctrine would by its terms no longer operate. *See* IA Areeda & Hovenkamp, *supra,* ¶ 241c, at 30; *cf. Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966). But unlike some other regulatory agencies, *see* IA Areeda & Hovenkamp, *supra,* ¶ 251i, at 161–62, FERC is still responsible for ensuring "just and reasonable" rates and, to that end, wholesale power rates continue to be filed and subject to agency review, 16 U.S.C. § 824d.

■ To be sure, FERC now waives its requirement that filed rates and rate increases be accompanied and justified by cost-of-service data, 18 C.F.R. §§ 35.12, 35.13, where the applicant has shown that it lacks, or has mitigated, market power in generation and transmission. *See generally Louisiana Energy & Power Auth. v. FERC,* 141 F.3d 364, 365 (D.C.Cir.1998).[8] But whether or not such data were submitted, the relevant rates and termination charge were individually filed with FERC and are subject to ongoing FERC regulation. It is the *filing* of the tariffs, and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine. *See Square D Co.,* 476 U.S. at 417, 106 S.Ct. 1922; *Mississippi Power & Light Co. v. Mississippi,* 487 U.S. 354, 374, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988).

Further, FERC did address the concerns presented by Norwood and others about the potential anticompetitive effects of the filings (albeit not in trial-type hearings). FERC found the contract termination charge to be in principle a reasonable recovery of expected revenues less avoided costs. *New England Power Co.,* 83 F.E.R.C. ¶ 61,174, at 61,723 (1998). As for the wholesale standard offer rate schedule, FERC explained its origins in state regulatory policy and was apparently unpersuaded by Norwood's objections. *New England Power Co.,* 82 F.E.R.C. ¶ 61,179, at 61,664–65 (1998); *see also New England Power Co.,* 83 F.E.R.C. ¶ 61,265 (1998). The agency left the door open for future administrative challenges to both the contract termination charge and the wholesale standard offer rate. *New England Power Co.,* 83 F.E.R.C. ¶ 61,174, at 61,724; *New England Power Co.,* 81 F.E.R.C. ¶ 61,281, at 62,371 (1997).

■ Norwood also objects that the filed rate doctrine only protects against damage claims and, it says, in this instance it seeks declaratory and injunctive relief; apparently it contemplates relief that would block or nullify the termination charge and possibly require the wholesale standard offer rates to be made available to it. It is quite true that one rationale of the filed rate doctrine is to prevent discriminatory damage awards to different customers, *Keogh,* 260 U.S. at 163, 43 S.Ct. 47, and that in at least two cases the Supreme Court carved out a potential exception for antitrust injunctive relief, *see Square D Co.,* 476 U.S. at 422 & n. 28, 106 S.Ct. 1922; *Georgia v. Pennsylvania Ry. Co.,* 324 U.S. 439, 454–62, 65 S.Ct. 716, 89 L.Ed. 1051 (1945).

■ But in *Georgia* and *Square D,* the Court was concerned with possible price-fixing conspiracies that conceivably could have been enjoined without tampering

---

**8.** FERC's regulations also provide an exception to the cost-of-service requirements for rate changes that do not amount to rate increases. 18 C.F.R. § 35.13(a)(2)(iii). This was the exception under which FERC originally accepted New England Power's contract termination charge and standard offer rates for filing, although it considered the no-market-power exception in the related divestiture proceeding. *New England Power Co.,* 82 F.E.R.C. ¶ 61,179, at 61,661–64 (1998).

with the tariffed rates themselves, *see Georgia*, 324 U.S. at 455, 65 S.Ct. 716; the relief would merely assure non-collaborative individual filings by the supposed conspirators. Here, any meaningful relief as to the price squeeze would require the *alteration* of tariffs—and not merely tariffs subject to regulation but tariffs actually scrutinized repeatedly by FERC in the companion-case proceedings. In part, the rationale for the filed rate doctrine is to protect the exclusive authority of the agency to accept or challenge such tariffs, *Arkansas La. Gas Co. v. Hall*, 453 U.S. 571, 577–78, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981)—a goal that would be undermined by Norwood's distinction in the present case.

■ Norwood also argues that the doctrine should not apply to block a claim brought by a plaintiff who is a *competitor* of the defendant—a view basically endorsed by the Areeda treatise, *see* IA Areeda & Hovenkamp, *supra*, ¶ 247c. But the lower courts are both divided and confused in their discussion of this issue; and there are more than two sides.[9] Attempts to reason from the few arguably relevant Supreme Court cases, *see AT&T v. Central Office Tel., Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998); *Georgia v. Pennsylvania Ry. Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), are almost hopelessly inconclusive, but no such exception for plaintiff-competitors has ever been explicitly adopted by that court.

This is a more doubtful case than most for developing a new "competitor" exception to the filed rate doctrine. Although Norwood may be in limited competition with New England Power affiliates, it is primarily a consumer challenging a filed rate that it does not want to pay (the contract termination charge), and—as we will see—its position as a "competitor" is

qualified. Although one case to which Norwood points has adopted a competitor exception where the plaintiff was both a competitor and a consumer, *City of Groton*, 662 F.2d at 927–29; *cf. City of Kirkwood*, 671 F.2d at 1179, it appears to have been a standard price squeeze case where one of the relevant prices was not reviewable by the federal agency. *City of Groton*, 662 F.2d at 927.

■ Finally, Norwood contends that a savings provision added by the Energy Policy Act of 1992, 16 U.S.C. § 824k(e)(2), somehow overrides the filed rate doctrine. The provision provides that "[s]ections 824i, 824j, 824l, 824m of this title, and this section, shall not be construed to modify, impair, or supersede the antitrust laws." *Id.* But by its terms this provision only refers to limited sections of the Federal Power Act, notably *not* including those that establish the rate filing requirements, 16 U.S.C. § 824d, and to which the filed rate doctrine relates.

As already noted, the law on the filed rate doctrine is extremely creaky. Our own principal price squeeze decision, *Town of Concord v. Boston Edison Co.*, 915 F.2d 17 (1st Cir.1990), *cert. denied*, 499 U.S. 931, 111 S.Ct. 1337, 113 L.Ed.2d 268 (1991), threw out the claim on the merits, expressing great skepticism about such claims as to regulated rates but never mentioning the filed rate doctrine. *Id.* at 25–29. Yet this case is not a good vehicle for considering any cutting back on the doctrine, to whatever extent *Square D* permits adjustment, partly because the Sherman Act claims pressed by Norwood are themselves so doubtful.

■ There are at least two grounds for extreme skepticism. The usual section 2 claim requires monopoly or near monopoly

---

9. *Compare Pinney Dock & Transp. Co. v. Penn Central Corp.*, 838 F.2d 1445, 1455–57 (6th Cir.) (no exception), *cert. denied*, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988), *with Cost Management Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 945–46 (9th Cir.1996) (exception in case where plaintiff was competitor, not customer), *and City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 927–29 (2d Cir.1981) (exception in case where plaintiff was customer and competitor).

power in some market, and a wrongful exclusionary act designed to enhance such power in that market or to achieve an improper advantage in another market. *E.g., Otter Tail Power Co. v. United States,* 410 U.S. 366, 377, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). It is not clear just what monopoly power Norwood attributes to New England Power, which has now sold its main generating assets and, so far as it may retain a dominant position in transmission, is constrained to wheel power for others under Order No. 888. *See New England Power Co.,* 82 F.E.R.C. ¶ 61,179, at 61,662 (1998).

Further, it is hard to see just what wrongful act is involved. Although sustained by FERC's regulatory policies, the termination charge is largely a surrogate for recovery of net proceeds from a prior contract renounced by Norwood; and the refusal to give Norwood the benefit of the wholesale standard offer rates appears to reflect the fact that as a municipality Norwood is not required to provide competitors access to its customers or afford them retail standard offer rates. Mass. Gen. Laws ch. 164, § 47A. These are very far from the usual kinds of wrongdoing that support a section 2 claim.

It is also very far from clear that Norwood is seriously threatened as a competitor. Apparently most of its customers are captive, *see* Mass. Gen. Laws ch. 164, § 47A, and Norwood has no obligation to give them access to other suppliers, *id.* Some fringe competition may exist for new customers who can choose where to locate, or old ones inclined to relocate—*e.g.,* cus-

tomers choosing between Norwood and adjoining communities serviced by Mass Electric. But the extent that such choices may be affected by the standard offer rates is unclear. The rates are not automatically available to benefit either new customers or those who move, Mass. Regs. Code tit. 220, § 11.04(9)(b)(2)(c); and the advantage they provide will disappear fairly soon because the rates quickly escalate.[10]

■ Of course, doubts about market power cannot be resolved on a motion to dismiss; and the "wrongful act" issue, although technically legal, has not been briefed and might depend in some measure on contextual facts at which we can only guess. But these doubts do reinforce a sense that this is not a case that calls out for revisiting the filed rate doctrine or for strenuous efforts to carve out exceptions that test the limits of the Supreme Court's reaffirmation of the doctrine in *Square D.*

■ Norwood also makes a section 1 claim that the standard offer rates New England Power promised to other retailers as part of the settlement somehow constitute horizontal price fixing. But offer of those rates to customers is an ordinary vertical transaction, and the settlement did not set rates for other wholesale suppliers; USGenNE's later assumption of the obligation is simply the transfer of the seller's existing obligation incident to a sale of assets.[11]

■ 4. This brings us to Norwood's other antitrust claim worth discussing, namely, that New England Power's sale of its fossil and hydroelectric generating assets violates section 7 of the Clayton Act.[12]

---

**10.** Norwood says that by that time customers will have chosen a permanent source of supply; but it is quite unclear why any customer should commit itself for the long term based on a rate advantage known to be very temporary.

**11.** Norwood's complaint also alleged tying in violation of section 1 of the Sherman Act, but Norwood does not discuss this claim on appeal and it is therefore waived. *Gamma Au-*

*dio & Video, Inc. v. Ean–Chea,* 11 F.3d 1106, 1113 (1st Cir.1993).

**12.** Norwood's complaint also alleged a violation of section 3 of the Clayton Act, 15 U.S.C. § 14, but it does not discuss this claim in its brief on appeal (save for a cursory mention in the statement of questions presented). The claim is therefore waived. *Gamma Audio & Video, Inc.,* 11 F.3d at 1113.

The main charge here is that the sale will enhance market power in the wholesale electricity market in New England and tend to exert upward pressure on wholesale prices to the detriment of purchasers in that market, including Norwood. This claim is very doubtful, but it is not clear how it can be resolved on this appeal solely upon a motion to dismiss.

Ordinarily, the transfer of generating assets to a new entrant could hardly reduce competition: it lessens the market power of the seller and adds a new competitor. But USGenNE's parent already owns some nearby generating assets (apparently in New York); and depending on their size and the definition of markets, in theory USGenNE and its New York affiliate could end up together with more market power than previously possessed by New England Power itself. True, market power in transmission and distribution may be vitiated by the open access requirements imposed by FERC's Order No. 888[13] (discussed further in our companion opinion); but greater concentration of generating assets in a few hands—the hands of USGenNE and its associated companies—could still be a problem, depending upon how feasible long distance transmission may be (and Norwood's complaint vaguely alleges some limitations).

On this claim, the filed rate doctrine is of no use to the defendants. For reasons that reflect more history than logic, the limitations on antitrust litigation derived from federal administrative regulation reflect a schizophrenic split. Direct antitrust attacks on federally regulated rates have (with some exceptions discussed above) been limited by the filed rate doctrine. *E.g., Square D Co.,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413. So have attacks on other regulated matters underlying rates (like power allocation among electricity customers). *See Mississippi Power & Light Co. v. Mississippi,* 487 U.S. 354, 371, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988); *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 966–67, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). But the Supreme Court says there is otherwise no across-the-board antitrust immunity for agency-approved transactions. *See California v. Federal Power Comm'n,* 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962).

Although it is not clear in all cases where the boundary lies between the filed rate doctrine and the default rule retaining antitrust liability, mergers or sales of assets by federally regulated utilities have been left open to antitrust challenge even though the resulting rates were subject to federal regulation and even though the merger or sale had been explicitly approved by the regulator. *See Northeast Utils. Serv. Co. v. FERC,* 993 F.2d 937, 947 (1st Cir.1993). *See generally California,* 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54. Sometimes federal agencies do have explicit power to immunize approved mergers, *see Denver & Rio Grande Western Ry. Co. v. United States,* 387 U.S. 485, 496–97, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967), but FERC does not. *Cf. South Austin Coalition Community Council v. SBC Communications Inc.,* 191 F.3d 842, 844 (7th Cir.1999).

This discrepancy in case-law treatment is debatable policy, *see generally* IA Areeda & Hovenkamp, *supra,* ¶ 243 (criticizing *California v. Federal Power Commission* ), and there may well be sound arguments for revisiting the issue in light of

---

**13.** Order No. 888, Promoting Wholesale Competition Through Open Access Non–Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, 61 Fed. Reg. 21540 (1996) (rule codified as revised at 18 C.F.R. pts. 35 & 385), *clarified,* 76 F.E.R.C. ¶ 61,009 (1996), 76 F.E.R.C. ¶ 61,347 (1996) and 79 F.E.R.C. 61,182 (1997), *order on reh'g,* Order No. 888–A, 62 Fed.Reg. 12274 (1997), *order on reh'g,* Order No. 888–B, 81 F.E.R.C. ¶ 61,248 (1997), *order on reh'g,* Order No. 888–C, 82 F.E.R.C. ¶ 61,046 (1998), *petitions for review pending sub nom. Transmission Access Policy Study Group v. FERC,* Nos. 97–1715, *et al.* (D.C.Cir. Mar. 30, 1998).

recent improvements in FERC's analysis of mergers and asset transfers, *see generally* Pierce, *The Antitrust Implications of Energy Restructuring*, 12 Nat. Resources & Env't 269 (1998). But the distinction has been adopted by the Supreme Court and never abandoned, *compare Otter Tail Power Co.*, 410 U.S. at 373, 93 S.Ct. 1022, *with Square D Co.*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413, and the defendants have not even attempted to defend the use of the filed rate doctrine to protect the sale.

■ Instead, New England Power argues that Norwood lacks standing to make a section 7 claim because the sale is not causally linked to Norwood's primary concern, the contract termination charge. But at least as a matter of pleading, Norwood is still entitled to make a section 7 claim as a consumer of wholesale power on the premise that the sale will increase concentration in the wholesale market and ultimately increase prices to it. PG & E says that Norwood is protected by its long-term contract with Northeast Utilities, but long-term is not forever and what Norwood purports to worry about is a long-term upward pressure on wholesale prices.

■ Alternatively, PG & E complains that Norwood's complaint has never identified the alleged pre and post-divestiture market shares attributed to PG & E affiliates. Just how much detail is required in notice-pleading complaints does not have a formulaic answer; we have been willing to sustain dismissals where a plaintiff's antitrust claim was expressed only in the bare words of the statute, seemed highly improbable, and was not strengthened by more specific detail offered in the face of a direct challenge on motion to dismiss. *See, e.g., DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 55–57 (1st Cir.1999); *see also* II Areeda & Turner, *Antitrust Law* § 317a, at 72 (1978).

But it is one thing to sustain a dismissal where the lack of detail was an issue pressed in the district court and the plaintiff, having had notice and incentive to respond, failed to do so by bolstering its complaint, either by amendment or by providing the requisite information in opposing dismissal. Here, this "lack of detail" claim was not clearly present in the district court and is not even close to its ground of disposition; and the section 7 claim, although doubtful on the facts, is not inherently impossible. *Cf. Tri–State Rubbish, Inc. v. Waste Management, Inc.*, 998 F.2d 1073, 1080–81 (1st Cir.1993). We think that a deficiency in detail is a matter to pursue on remand, although some form of summary disposition on this ground may yet be available.

A different reason for doubt as to the antitrust claim is that FERC itself found, after a regulatory analysis, that the sale would not enhance market power. *New England Power Co.*, 82 F.E.R.C. ¶ 61,179, at 61,658–59 (1998), *reh'g denied, New England Power Co.*, 83 F.E.R.C. ¶ 61,275 (1998). So far as we can tell, this determination rested in principal part on a judgment that power generated by USGenNE affiliates in New York was already committed under long-term contracts and was not therefore a viable constraint on prices in New England. *New England Power Co.*, 82 F.E.R.C. ¶ 61,179, at 61,659. This is akin to an approach taken by the Supreme Court itself in discounting the committed coal production of a merger partner. *See United States v. General Dynamics Corp.*, 415 U.S. 486, 501–11, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974).

Whatever its rationale, FERC's ultimate finding, if right, probably dooms Norwood's Clayton Act claim. There is no indication that FERC's test of competition (applying the same guidelines as the Department of Justice and Federal Trade Commission, *see New England Power Co.*, 82 F.E.R.C. ¶ 61,179, at 61,658 (1998)) is weaker or significantly different than that of the Clayton Act. *See* IV Areeda, Hovenkamp & Solow, *Antitrust Law* ¶ 932d (1998) (discussing judicial approval of DOJ–FTC guidelines). Norwood was a

party in the regulatory proceeding that led to the finding and actively contested the issue.

One might expect that FERC's finding in the regulatory proceeding would be binding on Norwood under the doctrine of issue preclusion. But the question turns out to be complicated: even where the parties are the same, issue preclusion based on an administrative determination is sometimes allowed and sometimes not, depending on the nature of the proceeding, the nature of the issue, the procedural rights afforded, and other considerations. *See Restatement (Second), Judgments* § 83 (1982); II Davis & Pierce, *Administrative Law Treatise* §§ 13.3–13.5 (3d ed.1994).[14] The preclusion issue has not been briefed by the parties in this court and, if it is to be pursued, this is best done on remand.

A final problem for Norwood relates to relief. Even on the doubtful assumption that the sale has created a threat of increased market power sufficient for a Clayton Act violation, it may be not easy for Norwood to show monetary damages now. And while divestiture is technically a remedy permitted to private parties in section 7 suits, the Supreme Court has suggested that it may not always be proper at the behest of private parties even where the government could have secured it. *California v. American Stores Co.,* 495 U.S. 271, 295–96, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990).

The parties may wish to consider on remand whether these loose ends justify further litigation. There may be an equitable case for some further accommodation of Norwood, at least as to the amount of any termination charge, especially if the settling parties have gotten better terms. *Cf. New England Power Co.,* 83 F.E.R.C. ¶ 61,174, at 61,723 n. 13 (1998). Given the possibilities of further expensive litigation

(on certiorari, in the district court, and at FERC), it may be worth the parties' time to consider a settlement before pressing further.

The district court's judgment dismissing the complaint on the merits is *affirmed* as to all claims other than that under section 7 of the Clayton Act; and the section 7 claim is *remanded* to the district court for further proceedings consistent with this decision.

*It is so ordered.*

---

14. *Compare Baez–Cruz v. Municipality of Comerio,* 140 F.3d 24, 29–31 (1st Cir.1998), and *EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc.,* 746 F.2d 375, 377–79 (7th Cir.1984), *with Second Taxing Dist. of Norwalk v. FERC,* 683 F.2d 477, 483–84 (D.C.Cir.1982), *and AT&T v. FCC,* 602 F.2d 401, 410 n. 48 (D.C.Cir.1979).