**UTILIMAX.COM, INC., Plaintiff,**

v.

**PPL ENERGY PLUS, LLC, PPL Corporation, ABC Corps. 1–10, John Does 1–10, Defendants.**

No. 02–CV–7160.

United States District Court, E.D. Pennsylvania.

July 18, 2003.

Brian J. Fruehling, Fruehling & Stevens, Madison, NJ, James K. Fruehling, Philadelphia, PA, for Plaintiff.

David L. Meyer, James R. Atwood, Vijay Shanker, Covington & Burling, Washington, DC, John G. Harkins, Jr., Karin E. Davis, Steven A. Reed, Harkins Cunningham, Philadelphia, PA, for Defendants.

### *MEMORANDUM & ORDER*

ANITA B. BRODY, District Judge.

During the period covered by this action, the plaintiff, Utilimax.com, Inc. ("Utilimax"), was licensed to purchase wholesale electricity and resell it in Pennsylvania's newly deregulated retail electricity market. The defendant, PPL Energy Plus ("PPL"),[1] sells retail electric energy, but also trades in the wholesale electricity market. In the complaint, Utilimax alleges that PPL violated the Sherman Act, the Clayton Act, and numerous state laws. Utilimax seeks monetary damages.

PPL moves to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) on the ground that its actions are protected under the "filed rate doctrine", a doctrine that bars claims that ask courts to review a

---

1. PPL Energy Plus is a wholly owned subsidiary of PPL Corporation that is also a defendant in this suit. For the purposes of the motion to dismiss, both defendants will be treated as one unit—"PPL".

rate set by a federal regulatory agency. I will grant the motion.

## I. Regulatory Background[2]

In 1935, Congress enacted the Federal Power Act ("FPA"), 16 U.S.C. §§ 791a–828c, which "established the Federal Power Commission to oversee the wholesale transmission and sale of interstate electric power." 49 Stat. 838 (1935) (codified as amended at 16 U.S.C. §§ 791a–825r). Congress gave the Federal Power Commission (now the Federal Energy Regulatory Commission ("FERC"))[3] plenary and exclusive jurisdiction over "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b).

FERC "fulfills a critical part of its mandate by setting 'just and reasonable' wholesale electric rates under §§ 205 and 206 of the Federal Power Act ('FPA'), 16 U.S.C. §§ 824d & 824e." *Ohio Power Co. v. FERC,* 954 F.2d 779, 781 (D.C.Cir.1992). The Act provides that:

> All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission [FERC], and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

16 U.S.C. § 824d(a); FPA § 205(a). In order to guarantee "just and reasonable"

rates, Section 205(c) of the FPA mandates that

> every public utility shall file with the Commission, within such time and in such form as the Commission may designate ... schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission.

16 U.S.C. § 824d(c), FPA § 205(a). FERC regulations specify that no public utility

> "shall directly or indirectly, demand, charge, collect or receive any rate, charge or compensation ... which is different from that provided in a rate schedule required to be on file with the Commission." 18 C.F.R. § 35.1(e).

■ As a regulatory agency, FERC has wide discretion to permit different types of rates. *See, e.g., Farmers Union Cent. Exch., Inc. v. FERC,* 734 F.2d 1486, 1501 (D.C.Cir.1984)("FERC is not required to adhere rigidly to a cost-based determination of rates.") Traditionally, however, FERC regulation involved a cost-based determination of rates. In other words, rates were decided by FERC based upon the cost of the electric energy involved. More recently, in the case of wholesale electricity, FERC has moved to a rate-based market mechanism for pricing electricity. In other words, rates are determined based upon the price obtained when electricity is traded on the market.[4] These rates paid by wholesale buyers remain subject to FERC jurisdiction and review. While utilities do not necessarily

---

**2.** A glossary of terms is attached at Appendix A.

**3.** In 1997, Congress reorganized the FPC as FERC.

**4.** The movement from cost-based rates to market-based rates has a complex and involved history. Interestingly, there is now a movement to return to cost-based rates. This

movement arose after several incidences of market manipulation, similar to that at issue in this case, in which a wholesale generation was able to game the wholesale electricity market. *See, e.g.,* The Energy Reliability and Stability Act of 2001, S. 80, 107th Cong. (2001)(Senators Gordon Smith and Dianne Feinstein introduced a bipartisan bill that would direct FERC to establish cost-based rates for wholesale electricity.)

file specific rates with FERC prior to selling energy, they sell pursuant to the terms, conditions and formulas established by FERC's regional wholesale electricity rules. FERC approves those rules in advance of authorizing the wholesale electricity markets to operate.

PJM Interconnection ("PJM") is a regional wholesale electricity market authorized by the Energy Policy Act of 1992 and established by FERC. Pursuant to rules approved by FERC and subject to FERC's on-going regulation of wholesale electricity markets, PJM coordinates the continuous buying, selling, and delivery of wholesale electricity through various auction markets designed to match supply with demand.

From January through April 2001, the time period involved in this case, PJM's control area included all of New Jersey, Delaware and Washington, D.C., and substantial portions of Pennsylvania and Maryland. Any entity in PJM's control area with transmission assets, generation assets or that wishes to purchase or sell electric power for resale, must be a member of PJM. Each member of PJM must also be a signatory to the PJM Operating Agreement. Many of the PJM's governance, market and operations structures are defined in a series of agreements and rules filed with and approved by FERC. Electric energy must be sold, purchased and transmitted according to the PJM's tariff agreements, operating manuals, and approved business practices.

Under rules approved by FERC and in operation throughout the time period covered in this controversy, each retail seller of electricity in the PJM must hold "capacity"-or capacity credits. Capacity is not the electric energy used to generate light and to power electrical equipment, but rather is the ability to generate electric energy when called upon to do so. Retail electric energy is the energy used by the retail public for lighting homes and by industry to power electrical equipment. The retail public is known as end-users of electricity. Those entities that supply electric energy to end-users are Load Serving Entities ("LSEs"). All LSEs are obliged to own, or acquire at wholesale, sufficient capacity resources to cover, as back-up, one day of energy sales that it has contracted to provide to its retail customers. This obligation is known as the "installed capacity," or "ICAP," obligation. The ICAP obligation is designed to ensure system reliability by requiring that all retail energy obligations be backed up by sufficient generation to produce the energy in question.

The structure of PJM's market for capacity is governed by a series of rate agreements filed with and approved by FERC under §§ 205 and 206 of the Federal Power Act. 16 U.S.C. §§ 824d & 824e. Under PJM rules, capacity requirements for each LSE are established in advance by PJM. An LSE can satisfy its capacity obligation by either self-supplying (using its own generation facilities) or purchasing capacity. LSEs that are unable to self-supply have the option of purchasing capacity by any of three methods: (a) acquiring capacity through bilateral contracts with other entities; (b) purchasing capacity credits in the PJM long-term auction market; or (c) purchasing capacity credits in the PJM daily auction market. All three of these methods are regulated by FERC and authorized by the PJM.

In the daily auction market, a party that has capacity in excess of its needs for the next day may set a price at which it offers to sell, through the PJM, its excess credits (a "Sell Offer"). An LSE that needs additional capacity to meet its capacity obligation for the upcoming day may make a bid, through the PJM, to buy the amount of capacity credits it needs ("a Buy Bid"). After receiving all the Sell Offers and Buy

Bids for the day in question, the PJM staff ranks the Sell Offers from the lowest to the highest and the Buy Bids from the highest to the lowest and thereby establishes the market-clearing price. The market-clearing price is the price at which the next Sell Offer is equal to or less than the next Buy Bid.[5] Sellers who offered to sell below the market-clearing price receive the market-clearing price and buyers who offered to buy above the market-clearing price pay the market-clearing price. During periods of tight supply, ICAP prices can reach relatively high levels. During periods of low demand, ICAP daily auction market prices often approached zero.

If an LSE fails to secure its needed capacity in time to meet its retail energy obligation, that LSE will—under FERC approved PJM rules—be assessed a "capacity deficiency rate" ("CDR").[6] That charge is based on a rate that has been approved and reviewed by FERC. Under PJM rules that were in effect in early 2001,[7] capacity deficient charges were assessed on a daily basis against deficient LSEs. The revenues from these charges were distributed to holders of unsold capacity to the extent the holders of unsold capacity had made their capacity available to the PJM pool. Those holders of capacity, in effect, sold the needed capacity to the deficient LSEs at the FERC-approved rate.[8] Once deficient LSEs paid the CDR

to the PJM, they were deemed to have met the requirement for sufficient capacity. In the first quarter of 2001, deficient LSEs paid capacity deficiency charges equal to $177.30/MW-day for all days on which they were deficient.[9] The capacity market rules further provided that a deficient LSE must pay twice the CDR, that is $354/MW-day, on days when the overall market was deficient. The overall market might become deficient during periods of high demand or when owners of generation "delist." Owners of generation are not required to commit their generation resources to PJM as ICAP but rather can "delist" those resources, that is, export them from the PJM control area.

The PJM daily auction market for capacity—in which prices increased in early 2001—is subject to FERC rate regulation. Moreover, because PJM capacity is within FERC's exclusive jurisdiction under the FPA, nobody anywhere may sell that capacity "outside" FERC's regulatory control over rates. This means that rates charged in bilateral capacity transactions are regulated to the same extent as those resulting from PJM auction market transactions: all purchases of capacity are regulated by FERC. It is impossible to escape FERC jurisdiction.

### III. Factual Background[10]

Plaintiff, Utilimax, was a LSE licensed to purchase wholesale electricity and resell

---

5. A good example of how the market clearing price is obtained is available at *PJM Capacity Credit Markets Operations/Business Rules: Market Clearing Example,* http://www.pjm.com.markets/capacity-credit/downloads/example.xls.

6. The CDR is, in effect, a fine set by FERC. During the first quarter of 2001, the CDR was $177.30 per megawatt per day ("MW-day").

7. This is the period of time at issue in the complaint.

8. Of course, no units of capacity actually changed hands.

9. The CDR of $177.30/MW-day reflects the projected daily carrying costs for installation of a new combustion turbine generator. *See PJM Interconnection, LLC,* 81 FERC ¶ 61,257, at 62, 276 n. 197, 1997 WL 760259 (1997).

10. When considering a 12(b)(6) motion to dismiss, the court accepts as true all the allegations set forth in the complaint, and the court must draw all reasonable inferences in the plaintiff's favor. *Ford v. Schering–Plough*

it in Pennsylvania's newly deregulated electricity market. Pl.'s Compl. ¶ 3. Utilimax was engaged as an LSE within the control area of PJM. *Id.* Defendant, PPL Energy Plus ("PPL"), is a subsidiary of PPL Corporation and markets and trades wholesale electricity, capacity, and other related products. *Id.* at ¶¶ 4–11. PPL Energy Plus is also a member of PJM. *Id.* at ¶ 13.

This case is about rates for capacity during a short period of time in the beginning of 2001. Utilimax alleges that, during the first quarter of 2001, PPL was the only entity that possessed uncommitted capacity in the PJM daily market. *Id.* at ¶ 59. This allowed PPL to exercise undue market power and effectively control the price of capacity in the daily ICAP or capacity auction. *Id.* at ¶ 53. The PJM rules permitted holders of unsold capacity, such as PPL, to either withhold that capacity from the market or offer it for sale at a price equal to the CDR ($177.30 per MW-day). *Id.* at ¶¶ 54–60. This, in turn, caused LSEs short of capacity to either be deficient (and pay the CDR, which then would be distributed to the withholder of unsold capacity resources) or to purchase capacity at a price equal to the CDR. *Id.* at 58.

As a result of PPL's pricing actions, the market-clearing price rose to levels at or above the capacity deficiency rate. *Id.* at 67. The deficient LSEs paid capacity deficiency charges equal to $177.30/MW-day for all days on which they were deficient. *Id.* at ¶ 55. In fact, prices reached $354/MW-day on January 3, 2001 as a result of the capacity market rules which provided that any deficient party must pay twice the

CDR on a day when the overall market is deficient, or short, and which required the entry of mandatory bids at twice the CDR for any deficient party. *Id.* at ¶¶ 54. The overall market was deficient on January 3, 2001. The total amount of capacity deficiency charges paid from January 1, 2001 to February 24, 2001 was $11,767,541, whereas the total deficiency charges were $1,000 or less for the period from October 1 to December 31, 2000 and for the period from March 1 to April 30, 2001. *Id.* at ¶¶ 85–86. PPL captured virtually 100% of the revenues resulting from capacity deficiency charges during the period from January to February. *Id.* at ¶ 84.

Utilimax and other LSEs were then forced to pay inflated capacity prices that put them out of business.[11] *Id.* at ¶¶ 65 & 88–89. Those particularly affected by the high prices were LSEs such as Utilimax who were relying primarily on the volatile daily auction market and had not met their capacity obligations in advance of the daily auctions by purchases in the longer-term bilateral and monthly auction markets.

This period of high daily capacity prices lasted three months—from January 1, 2001 until April, 2001. Beginning on May 1, 2001, FERC adopted changes in the PJM rules that included a new allocation formula for capacity deficient payments and a shift from daily to seasonal capacity obligations. After FERC adopted these changes, "the price of ICAP returned to normal levels." *Id.* at ¶ 68.

Utilimax claims that PPL's exercise of "undue market power" caused artificially high prices in the PJM daily market dur-

---

*Corp.*, 145 F.3d 601, 604 (3d Cir.1998); *see also Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir.1991)

11. "LSEs found to be in repeated default of their capacity obligation could also incur penalties, in addition to the capacity deficiency

rate. This included being faced with the consequences of a material breach under PJM rules (including civil suit in law or equity, commencement of a proceeding before the LSE's state regulatory agency for revocation of license or authority to serve, and civil actions for damages.)" *Id.* at ¶ 56.

ing the first quarter of 2001 and amounted to an exercise of monopoly power in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. *Id.* at ¶ 83. Utilimax states that "[t]he price set by PPL was not reasonable or competitive and bore no relation to market conditions of the first quarter of 2001 ... As a LSE, Utilimax was compelled to purchase capacity at the inflated capacity rate in order to meet its capacity obligation under PJM rules." *Id.* at ¶ 88.

Utilimax further claims a violation of the Clayton Act on the theory that PPL tried to penalize those LSEs that refused to buy power in long-term bilateral agreements and also discriminated against those market participants who did not themselves own generation capacity or who did not agree to long-term contracts—and thus relied on the ICAP daily market. Specifically, count nine of the complaint alleges a violation of Section 1 of the Clayton Act. The complaint states that "[b]eginning January 1, 2001, PPL did in fact charge inflated prices for ICAP and those LSEs that did not purchase ICAP from PPL ahead of January 1, 2001 were gauged." *Id.* at ¶ 154. Count ten of the complaint alleges a violation of Section 3 of the Clayton Act. The complaint states that PPL "misused the PJM ICAP rules with the objective of enriching themselves ... [and] as a direct result of defendants' discriminatory pricing strategy Utilimax has suffered damages." *Id.* at ¶ 160.

Utilimax also raises a variety of Pennsylvania state law claims, including fraud, interference with contracts, interference with prospective contracts, negligent interference causing economic losses, breach of good faith and fair dealing, and unjust enrichment.

## III. The "Filed Rate Doctrine"

■ Defendant moves to dismiss the complaint based upon the application of the "filed rate doctrine" to plaintiff's claims. Since the 1920s, the "filed rate" doctrine has barred antitrust recovery by parties claiming injury from the payment of a filed rate for goods or services. *Keogh v. Chicago Northwestern Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). The filed rate doctrine, where applicable, can be a defense to both federal antitrust actions and state law claims. *See Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 580, 101 S.Ct. 2925, 2931–32, 69 L.Ed.2d 856 (1981).

The Supreme Court first articulated the filed rate doctrine in *Keogh*. In *Keogh*, a shipper sued a railroad carrier for participating in a conspiracy to fix rates in violation of the Sherman Act. The Interstate Commerce Commission ("ICC") had previously approved the rates as reasonable. The plaintiff claimed damages for the difference between these rates and earlier, lower rates that the plaintiff alleged would have remained in effect if not for the conspiracy. The Supreme Court held that even though the Interstate Commerce Act ("ICA") did not immunize regulated carriers from government antitrust prosecution, it did preclude damage awards to private litigants. *See Keogh*, 260 U.S. at 161–62, 43 S.Ct. at 49.

The Court gave four reasons for its holding. First, because the subject rates were accepted by the ICC, they were the "legal" rates. The Court believed it inconsistent that Congress, in enacting the ICA, would intend that carriers could be sued for price-fixing when they were charging the rates required by law. Moreover, because damages were available in an ICC proceeding, the Court doubted that Congress intended to provide a duplicative remedy in the Sherman Act. Second, if the plaintiff were to prevail, it would receive a lower rate not available to other shippers. This situation would create, in effect, an arbitrary and discriminatory

rate, avoidance of which was one of the reasons for the ICA. Third, to establish injury, the plaintiff would be put to the task of proving hypothetical lower rates. Whether or not the agency would have actually approved a different rate was a question best left to the agency itself, rather than the courts. Finally, the plaintiff would have to overcome the problem of speculative calculation of damages. *Id.* at 162–64, 43 S.Ct. 47

■ The filed rate doctrine has been vigorously criticized by a number of leading commentators,[12] however, the Supreme Court has declined an invitation to overturn the doctrine set out in *Keogh.* Judge Friendly was one prominent critic of the filed rate doctrine. In an opinion the Supreme Court subsequently praised as "characteristically thoughtful and incisive," *Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 423, 106 S.Ct. 1922, 1930, 90 L.Ed.2d 413 (1986), Judge Friendly effectively invited the Supreme Court to overturn *Keogh. Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 760 F.2d 1347 (2d Cir.), *cert. granted,* 474 U.S. 815, 106 S.Ct. 57, 88 L.Ed.2d 47 (1985), *aff'd,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986). Judge Friendly noted that each of the rationales that may have justified the filed rate doctrine in 1922 had been undermined by subsequent legal developments. The Supreme Court, in *Square D Co. v. Niagara Frontier Tariff*

*Bureau, Inc.,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), conceded that *Keogh* may have been "unwise as a matter of policy" but reaffirmed it nonetheless, on the ground that Congress had ample opportunity to overturn it but had not done so. *Square D,* 476 U.S. at 420, 106 S.Ct. at 1927–31. Offering a narrow interpretation of the filed rate doctrine, the Court stated that *"Keogh* simply held that an award of treble damages is not an available remedy for a private shipper claiming that the rate submitted to, and approved by, the ICC was the product of an antitrust violation." *Id.* at 422, 106 S.Ct. at 1929. In other words, the filed rate doctrine bars recovery in overcharge actions by customers based on claims that a "filed rate" constitutes an antitrust violation.

■ In the electricity context, it is FERC's responsibility to set and ensure compliance with just and reasonable rates of wholesale electricity sale and transmission.[13] Once FERC creates the mechanism for establishing rates for electricity, and electricity generators file their rates with FERC, as they are required to do by law, they are insulated from lawsuits challenging those rates and from court orders having the effect of imposing a rate other than those filed with FERC. Courts, both state and federal, are prohibited from considering any rate other than those filed with FERC to be the appropriate wholesale rate. Thus, "[t]he filed rate doctrine

12. For example, Professor Hovenkamp has argued that "[n]one of these arguments [in *Keogh* ] had much to be said for them at the time they were originally made, and they are even less sensible today." *Federal Antitrust Policy: The Law of Competition and its Practice* § 19.6, at 660 (West 1994); *see also* P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 247b & c, at 107–10 (2000)(arguing that modern legal developments have undermined rationales for *Keogh* doctrine).

13. *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951) applied the filed rate doctrine to rates filed with the Federal Power Commission (FERC's predecessor). *See id. at* 251–52, 71 S.Ct. at 695. The Court held that: the right to a reasonable rate is the right to the rate which the Commission files or fixes, and that, except for review of the Commission's orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one. *Id.*

prohibits a party from recovering damages measured by comparing the filed rate and the rate that might have been approved absent the conduct at issue." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir.1992). Because its underpinning is the idea that rates resulting from tariffs filed with and governed by a regulatory agency are considered *per se* reasonable even assuming anti-competitive behavior, the filed rate doctrine applies regardless of allegations of market manipulation.

In 1979, the Third Circuit first carved out what is sometimes referred to as the "competitor exception" to the filed rate doctrine. *See Essential Communications Systems, Inc. v. AT & T*, 610 F.2d 1114 (3d Cir.1979). In *Essential Communications*, the plaintiff, Essential, filed a complaint charging AT & T and NJ Bell with violations of the Sherman Act. The defendants provided telephone service to retail customers and also competed with Essential in the distribution of a telephone answering device called a Code–a–Phone.

Prior to November 1, 1968, the Bell System (the predecessor of AT & T and NJ Bell) maintained a monopoly in the distribution, installation and service of telephone terminal equipment. After November 1, 1968, the Federal Communications Commission ("FCC") opened the telephone terminal equipment market to competition. Essential then entered the market and began to compete against the defendants in the distribution, installation and service of Code–a–Phones.

At that time, AT & T and NJ Bell filed a new rate with the FCC that required their retail telephone customers who used Essential's Code–a–Phone to lease an additional special device before receiving their service. This surcharge, or "add-on", only applied to those Bell System customers using an Essential Code–a–Phone. Customers who bought a Code–a–Phone from the defendants were not required to lease the additional device. It was alleged that this was done by AT & T and NJ Bell to hinder competition by Essential. Asserting that the additional device and its accompanying surcharge were unnecessary, Essential alleged it was the victim of an antitrust conspiracy and claimed damages for loss of business.

The defendants filed a motion to dismiss, arguing that the plaintiff's claims were barred by the filed rate doctrine. The Third Circuit denied the motion to dismiss. The court stated that the filed rate doctrine had "little or nothing to do with AT & T's duties under the antitrust laws towards its competitors in the equipment supply business; competitors are not the intended beneficiaries of that rule of public utility regulation." *Essential Communications*, 610 F.2d at 1121. The court reasoned that the intended beneficiaries of rates filed with regulatory agencies were customers, not competitors of the regulated utility. The court held that because the plaintiff was not suing in the capacity of a customer for retail telephone service, the claim was not barred by the filed rate doctrine. *Id.* at 1122. In fact, Essential had never purchased (nor was it in the position to purchase) retail telephone services from the defendants. Moreover, the plaintiff was not contesting the rates filed with the FCC, but rather the non-rate anti-competitive add-on that only Essential customers were forced to purchase.[14] By contrast, the court stated that "[i]f this suit were brought by Bell System customers for recovery of damages because the filed

---

**14.** To highlight this point, the court noted that the plaintiffs did not ask for a rebate from rates paid, as the plaintiff had in *Keogh*. *Id.* at 1122. Rather, the plaintiffs sought re- lief from the anti-competitive effect of the add-on Essential customers were forced to purchase.

[rate] imposed excess costs upon them, we would probably have to conclude that the filed [rate] doctrine precluded [ ] damage recovery under § 4 of the Clayton Act." *Id.* at 1121.

The Second, Eighth, and Ninth Circuits have all considered the competitor exception to the filed rate doctrine and held that the filed rate doctrine does not preclude rate-related suits brought by competitors of regulated entities.[15] *See Cost Management Services, Inc. v. Washington Natural Gas Company,* 99 F.3d 937 (9th Cir.1996)(exception in case where plaintiff was competitor, not customer); *City of Kirkwood v. Union Elec. Co.,* 671 F.2d 1173, 1179 (8th Cir.1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983); *City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921, 929 (2d Cir.1981)(exception in case where plaintiff was customer and competitor). In *City of Kirkwood,* the Eighth Circuit explained that the filed rate doctrine did not apply to competitor suits because "[a] rule formulated to ensure uniformity of rates as between customers should not give any unfair advantage to a utility in its dealings with competitors." *City of Kirkwood,* 671 F.2d at 1179.

On the other hand, the Sixth Circuit has concluded that the filed rate doctrine bars rate-related claims brought by competitors. *See Pinney Dock & Transport Co. v. Penn Central Corp.,* 838 F.2d 1445 (6th Cir.1988), *cert. denied,* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988).[16] The

*Pinney Dock* court conceded, however, that "the anti-discrimination arguments behind the *Keogh* doctrine lose their force in competitor lawsuits such as this." *Id.* at 1457.

The First Circuit, in *Town of Norwood v. New England Power Co.,* 202 F.3d 408 (1st Cir.2000), also declined to extend a competitor exception, but did not reject such an exception outright. In that case, plaintiff was both a competitor and a customer of the defendant and its antitrust claims involved an alleged price squeeze. A "price squeeze involves a defendant who as a monopolist supplies the plaintiff at one level (e.g., wholesale), competes at another (e.g., retail), and seeks to destroy the plaintiff by holding up the wholesale price to the plaintiff while depressing the retail price to common customers." *Id.* at 418. The court declined to extend a competitor exception and found the plaintiff's antitrust claims to be barred by the filed rate doctrine. The court held that although the plaintiff might be in limited competition with the defendant, it was primarily a consumer challenging a filed rate that it did not want to pay. *Id.* at 420.

In 1993, the Third Circuit reaffirmed the competitor exception. *See In re Lower Lake Erie Iron Ore Antitrust Litigation,* 998 F.2d 1144 (3d Cir.1993) (hereinafter *"Lower Lake Erie"*). In *Lower Lake Erie,* steel companies, trucking companies, and dock companies brought suit against a railroad company, B & LE,[17] alleging that B & LE conspired with other railroad

---

**15.** In *Square D,* while the Supreme Court did not consider the creation of a competitor exception, it did provide a narrowed interpretation of the filed rate doctrine. *Square D,* 476 U.S. at 421–22, 106 S.Ct. at 1929–30.

**16.** One district court that relied on *Pinney Dock* also held that Keogh bars competitor suits. *See Lifschultz Fast Freight, Inc. v. Consolidated Freightways Corp. of Delaware,* 805 F.Supp. 1277 (D.S.C.1992), *aff'd,* 998 F.2d

1009 (4th Cir. July 6, 1993) (unpublished disposition), *cert denied,* 510 U.S. 993, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993).

**17.** Originally, the plaintiffs brought suit against several railroad companies, however, the claims against all of the defendants, except B & LE, were settled or dismissed before or during trial, leaving B & LE as the sole defendant. *See id.* at 1151, n. 1.

companies to eliminate competition and monopolize the transportation and handling of iron ore. The plaintiffs contended that the railroads "conspired ... to preclude potential competitors entering the market of lake transport, dock handling, storage and land transport of iron ore." *Id.* at 1151.

The iron ore at issue in *Lower Lake Erie* originated from mines in Minnesota, Michigan and eastern Canada and was brought to the steel companies' plants by ships traveling across the Great Lakes. The iron ore was then unloaded at railroad-owned docks along lower Lake Michigan, Lake Erie and the Detroit River. *See id.* at 1152. The traditional method of unloading iron ore from the vessels was by use of huletts, large cranes affixed to the docks. *See id.* at 1153. The huletts lifted the ore from the ships and either placed it in waiting railroad cars for immediate shipment or placed it in a storage facility located at the docks. *See id.* "Some of the docks [were] located directly adjacent to steel mills, but most of the ore was reloaded at the dock onto land-based transportation, most often railroads, for delivery to the inland mills. The non-railroad docks were not competitors for this segment of the iron ore business because they were not equipped with huletts." *Id.*

In the 1950s, innovations in iron ore production technology made possible the transport of the ore by means of self-unloading vessels, capable of unloading cargo by means of a conveyor belt without the use of a hulett. *See id.* Self-unloaders could carry greater loads than conventional ships and could unload in significantly less time at docks which did not require special handling equipment and crews. *See id.* Using self-unloaders, more efficient non-railroad docks could compete against the railroads, thereby reducing shipping costs to the steel companies. The

plaintiffs in *Lower Lake Erie* contended that the railroads plotted to halt the progress of self-unloader technology to maintain the railroads' dominance in the iron ore transport market. *Id.* at 1153.

The plaintiffs were divided into two classes, steel companies that were customers of the defendant railroads and the other transportation companies, that is the trucking and dock handling companies, that were competitors of the railroads. *See, id.* at 1158 n. 4. The defendant railroad, B & LE, argued that the claims of all the defendants—both customers and competitors—were barred by the filed rate doctrine. B & LE contended that the filed rate doctrine applied because the railroad charged rates regulated by the ICC. The Third Circuit allowed the plaintiffs' claims to proceed, but justified proceeding as to each class of plaintiffs differently.

The Third Circuit allowed the claims of the steel companies—the railroad's customers—to go forward because they were based on "non-rate anti-competitive activity." *Id.* at 1159. The court concluded that through non-rate activities, namely, restricting the development of self-unloader technology, the railroads effectively retarded entry of lower cost competitors into the market. Citing *Square D,* the court noted that the filed rate doctrine merely prevents private plaintiffs from sustaining an award of damages by claiming that approved *rates* were the product of an antitrust violation. *Id.* at 1159 (citing *Square D,* 476 U.S. at 422, 106 S.Ct. at 1929). However, the filed rate doctrine's "protection does not preclude liability based on *non-rate* anti-competitive activity." *Id.* (emphasis added). As the court further explained, "the instrument of damage to the steel companies was [non-rate activity]. In contrast, the Supreme Court in *Keogh* made it clear that 'the instrument by which Keogh is alleged to have been

damaged is rates approved by [a federal regulatory agency].'" *Id.* at 1159 (citing *Keogh,* 260 U.S. at 161, 43 S.Ct. at 49). Because the filed rate doctrine only applies when a customer challenges a rate filed with a federal regulatory agency, the court allowed the steel companies to proceed with their claims.

The court also allowed the claims of the dock and trucking companies—the railroad's competitors—to go forward. The court held that the claims were not barred by the filed rate doctrine because the filed rate doctrine "does not apply to claims of competitors." *Id.* at 1161. Citing *Essential,* the court again stated that: "the filed [rate doctrine] has little or nothing to do with [defendants] duties under the antitrust laws toward its competitors ...; competitors are not the intended beneficiaries of the rule of public utility regulation." *Id.* at 1161 (citing *Essential,* 610 F.2d at 1121).

## IV. The Filed Rate Doctrine Bars Recovery by Utilimax

■■■ Given the exclusive jurisdiction of FERC over the PJM wholesale market, PPL argues that Utilimax's claims are barred by the filed rate doctrine. PPL contends that the court should apply the doctrine to dismiss plaintiff's claims because, in order to resolve those claims, the Court would have to do precisely what the doctrine forbids, namely, set a rate different from that chosen by FERC. I agree with the defendant—the filed rate doctrine indeed bars plaintiff's claims. The filed rate doctrine bars all claims—state and federal—that contend that the instrument by which the plaintiff is alleged to have been damaged is a rate approved by a federal agency. *See Lower Lake Erie,* 998

F.2d at 1159. Utilimax's claims ask the court to do exactly that.

Utilimax's complaint seeks damages on the ground that antitrust activities caused it to pay an inflated rate for capacity in a market that was created by and that continues to be governed by rates on file with and approved by FERC. Utilimax asks for that which *Keogh* and its progeny will not allow. "[D]amages are not an available remedy for a [plaintiff] claiming that the rate submitted to, and approved by, [FERC] was the product of an antitrust violation." *Square D Co. & Big D Building Supply v. Niagara Frontier Tariff Bureau, Inc., et al.,* 476 U.S. 409, 422, 106 S.Ct. 1922, 1929, 90 L.Ed.2d 413 (1986).

In the sale of capacity, PPL followed the specific procedure authorized by FERC through the PJM: it used the PJM auctions, it sometimes delisted capacity and sold outside the PJM area and it entered into long-term contracts with some companies. Granted, the outcome may not have been that anticipated by FERC. In fact, the procedures PPL followed were later amended because they were found to be highly unfair and subject to manipulation. Nevertheless, PPL did adhere to the procedures set up by PJM under the rules established by FERC, which now protects PPL from antitrust liability.

■■■ The filed rate doctrine applies in this case for the very same reasons first articulated by the Supreme Court in *Keogh.* First, because the subject rates were accepted by FERC, they are the "legal" rates. It is inconsistent that Congress, in enacting the FPA, would intend that wholesale energy generators, such as PPL, could be sued for market manipulation when they were charging the rates permitted by law.[18] *Keogh* at 162–63, 43

18. The filed rate doctrine applies to bar claims challenging the rates set by FERC in a market-based rate system. *See Town of Norwood, Mass. v. New England Power Co.,* 202 F.3d 408, 419 (1st Cir.2000)(finding filed rate doctrine should apply where the "regulated rates" have been left to the free market). In this case, although the rates charged were market-based rates, FERC approved these

S.Ct. 47. Second, if Utilimax were to prevail, it would receive a lower rate not available to other LSEs. This situation would create, in effect, a discriminatory rebate, avoidance of which was one of the reasons for the FPA. *Id.* Third, to establish injury, Utilimax would be put to the task of proving hypothetical lower rates which would have been charged in the absence of market manipulation and the acceptability of those rates to FERC. Additionally, Utilimax would have to overcome the problem of speculative calculation of damages. *Id.*

▮ In an attempt to bring its claims outside the filed rate doctrine, Utilimax argues that the competitor exception articulated in *Essential* and reiterated in *Lower Lake Erie* should be applied in this case. The Third Circuit, in *Essential* and *Lower Lake Erie*, did distinguish between rate-related claims brought by those who were customers of the defendant—where the filed rate doctrine applied—and claims that were either not rate-related or were being asserted by competitors—where the doctrine did not apply. In order to come within the exception created by the Third Circuit, Utilimax's must either allege claims that are not rate-related or assert their claims in the context of a competitor. Utilimax does neither.

The first question is whether Utilimax's claims are rate-related. Utilimax asserts that its claims, like those allowed to proceed in *Essential* and *Lower Lake Erie*, are based on non-rate anti-competitive activity. This is simply incorrect. In *Essential*, the plaintiff complained about the non-rate "add-on", that is the additional device Essential customers were required to lease if they received retail telephone service from the Bell System. In *Lower Lake Erie*, the plaintiffs also complained

about non-rate activity, that is the railroad companies' alleged plot to halt the progress of self-unloader technology. The central theory of Utilimax's complaint, however, is that it was forced to pay excessive rates when it purchased capacity in a market regulated by rates set by FERC. Whether or not these rates were inflated as a result of PPL's anti-competitive motives is irrelevant, Utilimax is clearly objecting to the actual rates and not some non-rate activity.

In its complaint, Utilimax asserts that absent PPL's improper conduct and anti-competitive acts, it would have paid different rates. . Each of the causes of action brought by Utilimax directly relate to the rates it paid as a customer in the PJM capacity market. As to its Sherman Act claims, Utilimax seeks damages because it was "compelled to purchase capacity at the inflated capacity rate in order to meet its capacity obligation under PJM rules ... Utilimax was injured as a primary result of the unlawful inflating of capacity prices ..." Pl.'s Compl. at ¶¶ 88–89. As to its Clayton Act claims, Utilimax seeks damages because the "[p]rice offered was substantially higher than that typically offered to LSEs on bilateral ICAP contracts and for the period in question." *Id.* at ¶ 150. As to its state law claims, Utilimax seeks damages because, among other thing, the "[a]rtificially inflated ICAP prices were in effect the fraudulent creation of PPL, as the prices were not competitive." *Id.* at ¶ 99. Utilimax further pinpointed the rate-related focus of its claims at oral argument when it stated "the prices that were charged, which is what we're complaining about, were not competitive prices." Tr. at 12. Thus, "[i]t is clear that the instrument by which [Utilimax] is al-

rates as a means of achieving "just and reasonable" rates in advance of authorizing the PJM market to operate. As such, the rates

charged by wholesale electricity generators were the legal rates and the filed rate doctrine applies.

leged to have been damaged is rates approved by [FERC]." *Keogh,* 260 U.S. at 161, 43 S.Ct. at 49.

Utilimax specifically seeks as redress the difference between the charged rates and the different hypothetical rates it believes would have been achieved in a competitive market. In order to resolve Utilimax's claims and provide it the damages it seeks, the court would be required to assume a hypothetical rate different from that actually set by FERC. Unlike the plaintiffs in *Essential* and *Lower Lake Erie,* Utilimax's complaint focuses exclusively on PPL's rate-related activity. As such, Utilimax fails in its attempt to bring its claims outside the filed rate doctrine by asserting that the violation complained of was a non-rate activity.

The second question is whether Utilimax filed its complaint in the context of a competitor or a customer of PPL. Utilimax asserts that its claims, like those allowed to proceed in *Essential* and *Lower Lake Erie,* are brought in the context of a competitor. *See* Pl.s Mem. Opp'n Mot. Dismiss at 11. This is incorrect. In *Essential,* the plaintiff was solely a competitor of the defendants. The parties competed in the market for Code–a–Phones and the plaintiff did not purchase, nor was it ever in the position to purchase, goods and services from the defendants. In *Lower Lake Erie,* the dock and trucking companies were also solely competitors of the defendant. The parties competed in the iron ore transport business and the plaintiffs were never customers of the defendant.

The catch here is that Utilimax is both a competitor and a customer of PPL.[19] Utilimax and PPL compete for business in the retail energy market, they are both LSEs. However, in the wholesale power capacity market, Utilimax is a customer of PPL. Because PPL formerly held a monopoly position in power generation, PPL is the main generator of wholesale energy in the PJM market. As a result, PPL has enough capacity to satisfy its requirements and then sells its excess to other LSEs such as Utilimax. PPL sells this excess through the wholesale capacity credit market in the PJM, which was created and controlled by FERC. Although Utilimax happens to be a competitor of PPL in the retail market, this is but analytically incidental in the legal world, although, of course, not incidental to Utilimax in the business world. In the capacity credit market, the market at issue in this case, Utilimax is solely a customer purchasing wholesale energy credits.[20]

In order to come within the competitor exception, Utilimax's complaint must be made solely in the context of a competitor. Utilimax fails to come within this exception. Utilimax's complaint states that the alleged violations occurred in the customer context of the capacity market. As to its Sherman Act claims, Utilimax seeks damages because it was "compelled to purchase capacity at the inflated capacity rate in order to meet its capacity obligation under PJM rules ... Utilimax was injured as a primary result of the unlawful inflating of capacity prices ..." Pl.'s Compl. at ¶¶ 88–89. As to its Clayton Act claims, Utilimax states that "PPL's strategy was

---

**19.** Utilimax's position is most similar to that of the plaintiff in *Norwood,* 202 F.3d. at 420, where the First Circuit declined to extend the competitor exception.

**20.** Utilimax concedes in its complaint that there are two separate markets, stating:

"The competitiveness of Pennsylvania's retail electricity market depends largely upon the effectiveness and efficiency of the region's wholesale electricity markets." Plaintiff's Complaint at 3, ¶ 15.

to offer ICAP at more favorable prices for long-term agreements and gouge LSEs that elected to purchase ICAP on the [daily auction] market." *Id.* at 153. As to its state law claims, Utilimax states, among other things, that the "economic injuries to Utilimax were proximately caused by [d]efendants' failure to take reasonable measures to avoid the risk of causing economic damages to Utilimax and other LSEs, which [d]efendants knew were buying power on the [daily auction] market." *Id.* at ¶ 129.

While PPL's actions may have indirectly affected Utilimax's ability to compete in the retail market, Utilimax's direct injury arises from actions that occurred in the wholesale market where Utilimax is a customer of PPL. Thus, although Utilimax might be in competition with PPL in the retail market, in this case Utilimax has brought suit as a customer challenging a filed rate that it did not want to pay. The exception in *Essential* and *Lower Lake Erie* applies solely to those claims made in the context of a competitor. As such, Utilimax's claims do not fall under the competitor exception and are barred by the filed rate doctrine.

## V. Conclusion

I will sustain PPL's defense under the filed rate doctrine and, therefore, I will grant PPL's motion to dismiss and dismiss Utilimax's complaint.

Appendix A

### *GLOSSARY OF TERMS*

Capacity   Also known as capacity credits. The ability to generate electric energy when called upon to do so.

CDR   Capacity Deficiency Rate. A charge assessed against an LSE, under FERC approved PJM rules, if an LSE fails to secure its needed capacity in time to meet its retail energy obligation. The CDR is, in effect, a fine. The charge is based on a rate that has been approved and reviewed by FERC. During the first quarter of 2001, the CDR was $177.30 per MW-day.

FERC   Federal Energy Regulatory Commission (formerly known as the Federal Power Commission). Has plenary and exclusive jurisdiction over the transmission of electric energy in interstate commerce and the sale of electric energy at wholesale in interstate commerce. Responsible for setting "just and reasonable" rates for wholesale power.

FPA   Federal Power Act. Established the Federal Power Commission to oversee the wholesale transmission and sale of interstate electric power.

ICA   Interstate Commerce Act

ICAP   Installed Capacity. Sufficient capacity resources to cover, as backup, one day of energy sales that a LSE has contracted to provide to its retail customers. The ICAP obligation is designed to ensure system reliability by requiring that all retail energy obligations be backed up by sufficient generation to produce the energy in question.

ICC   Interstate Commerce Commission

LSE   Load Serving Entity. An entity that supplies retail energy to end-users, such as homes and businesses.

PJM   PJM Interconnection. A regional wholesale electricity market authorized by the Energy Policy Act of 1992 and established by FERC. PJM coordinates the continuous buying, selling, and delivery of wholesale electricity through various auction mar-